IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

GQ SAND, LLC,

                    Plaintiff and Counterclaim Defendant,        OPINION AND ORDER

          v.                                                                  15-cv-152-wmc

CONLEY BULK SERVICES, LLC,

                    Defendant, Counterclaim Plaintiff and Crossclaim Defendant ,

RANGE MANAGEMENT SYSTEMS, LLC, and

                    Defendant and Counterclaim Plaintiff,

          and

NEJGID, LLC,

                    Defendant and Counterclaim/Crossclaim Plaintiff.

Plaintiff GQ Sand, LLC, brings this civil action against defendants Conley Bulk Services, LLC ("CBS"), Range Management Systems, LLC ("RMS") and NEJGID, LLC, arising out of a multi-million dollar frac sand deal gone awry.  Defendants have in turn filed counterclaims against plaintiff.  Finally, defendant NEJGID has asserted a crossclaim against defendant CBS.

Now before the court are GQ Sand's motion for summary judgment on claims it asserted against the three defendants, as well as CBS's motion for summary judgment on its breach of contract counterclaim against GQ Sand.  (Dkt. ##50, 72.)  Save for GQ Sand's motion for summary judgment on negligence and misrepresentation claims againt RMS, the court finds genuine issues of material fact preclude entry of summary judgment on any of the parties' claims.

UNDISPUTED FACTS[1]

## A. The Parties

Plaintiff and counterclaim defendant GQ Sand, LLC, is a Wisconsin limited liability company, with its principal place of business located in Mazomanie, Wisconsin. Josh Quisling and Joe Gargano are the sole members of GQ Sand. Quisling is a citizen of Nevada; and Gargano is a citizen of Wisconsin.

Defendant, counterclaim plaintiff and crossclaim defendant Conley Bulk Services, LLC ("CBS") is a Texas limited liability company, with its principal place of business located in Weatherford, Texas. CBS's sole member is Transportation II, Inc., which is incorporated in Arkansas, with its principal place of business also located in that state. Rory Conley is CBS's President, and Brock Brockinton is its Vice President. CBS provides truck transportation and procurement services of hydraulic fracturing proponents to the petroleum industry.[2]

---

[1] In opposing GQ Sand's motion, RMS and NEJGID propose to submit "additional findings of fact all of those facts set forth in the Declaration of Cody Lyons." (R-N's Add'l PFOFs (dkt. #105) ¶ 2.) This submission is contrary to the court's procedures for summary judgment (5/28/15 Order (dkt. #27) 12), and indeed, entirely undercuts the value from the court's perspective of the proposed findings process. Nonetheless, the court reviewed Lyon's declaration but has not set forth his statements below, unless RMS otherwise relied on Lyon's declaration in responding to plaintiff's motion for summary judgment. The court also notes that many of his statements extend beyond his personal knowledge. Indeed, some of his averments touch on areas of expert opinion, and there is no indication that he has been disclosed as an expert. Moreover, defendants RMS and NEJGID in their combined opposition brief and defendant CBS in its own opposition, sets forth several pages of facts without any citations to the proposed findings of facts or the record. Consistent with its practice, the court has limited its review to the proposed findings of facts in setting forth the undisputed facts. With that aside, unless otherwise noted, the court finds the following facts material and undisputed.

[2] As previously noted, and despite the same spelling of my last name, I have *no* known relationship to this entity or *any* of its officers.

Defendant and counterclaim plaintiff Range Management Systems, LLC ("RMS"), is a Texas limited liability company, with its principal place of business located in Kellar, Texas. RMS's sole member is Cody Lyon, a citizen of Texas. RMS is in the business of lending railcars, and then using those railcars to arrange for the transport of goods and materials for others.

Finally, defendant and counterclaim/crossclaim plaintiff NEJGID, LLC, is a Texas limited liability company, with its principal place of business in Austin, Texas. NEJGID's sole member at all times relevant to this matter was Carl Hudspeth. Hudspeth is a citizen of Texas. RMS's Lyon testified at his deposition that at some point in 2015, Lyon purchased NEJGID from Hudspeth.

As such, the defendants are all citizens of different states (Texas and Arkansas) than the plaintiff (Nevada and Wisconsin). Moreover, the amount in controversy exceeds $75,000.

## B. GQ Sand's and CBS's Sand Supply Agreement

### i. Events Leading up to Agreement

On or about December 2, 2014, CBS contracted to sell to Advanced Stimulation Technologies ("AST"), "certain types of API [American Petroleum Institute] and ISO [International Organization for Standardization] quality sand for hydraulic fracturing operations." (Watt Decl., Ex. 1 (dkt. #69-1).) Specifically, the AST contract required CBS to sell AST 10,000 tons each of frac sand with the following specifications: 20/40 grade sand of 7-K API quality; 30/50 grade sand of 8-K API quality; and 40/70 grade sand of 9-K API quality. (*Id.*) The size of the sand grains determines the grade of the

sand.  For example, 20/40 grade sand means that 90 percent of the sand is small enough to pass through a 20 mesh screen, but large enough to be retained on a 40 mesh screen.[3] The "K value" represents the crush strength of the frac sand and is defined by the pressure applied to the sand in thousands of pounds per square inch.

Shortly after CBS entered into the AST contract, Hudspeth, the manager of defendant NEJGID, introduced Brockinton, CBS's Vice President, to Quisling of plaintiff GQ Sand, as a potential provider of sand to service the AST contract.  Specifically, the parties discussed whether GQ Sand could source the sand and railcars, as well as manage the delivery of sand to a trans-loading facility designated by CBS.  On December 19, 2014, Brockinton sent Quisling a draft contract.  Over the next two to three weeks, CBS and GQ Sand negotiated the final language of an agreement.  On December 23, CBS sent back a marked-up version highlighting "areas of concern," including a note that the "Account" referred to in § 1.9 must be an escrow account.  (CBS's Add'l PFOFs (dkt. #95) ¶ 2 (quoting Salman Decl., Ex. 4 (dkt. 98-4) 8).)  During these negotiations, both parties were represented by counsel, Attorney Steven Brezinski for GQ Sand and Attorney Matt Lindsay for CBS.

On December 29, Attorney Brezinski, on behalf of GQ Sand, stated that "[t]here needs to be a deposit which GQ [Sand] can use to cover their costs outside of the escrow account equal to the amount to be paid for the first and last shipments.  Future payments can be made from the escrow account."  (CBS's PFOFs (dkt. #74) ¶ 54 (citing Lindsay

---

[3] "Mesh is often used in determining the particle-size distribution of a granular material."  *See* https://en.wikipedia.org/wiki/Mesh_%28scale%29 (last visited June 9, 2016).  By way of comparison, 20 U.S. mesh converts to 0.0331 inches or 0.841 millimeters, while 40 mesh converts to 0.0165 inches or 0.4 millimeters.  *Id.*

Aff. (dkt. #76) ¶ 4).)   On January 2, 2015, Attorney Lindsey, on behalf of CBS, responded that it would "[p]rovide a cash payment outside of escrow of $157,000.00 within 7 days of the signing of a purchase agreement" and would "[p]lace an additional $628,000.00 in escrow and agree to fund it as we previously set forth."   (*Id.* at ¶ 55 (citing Lindsay Aff., Ex. B (dkt. #76-2)).)

On January 13, 2015, Quisling and Gargano for GQ Sand met in Madison, Wisconsin, with Brockinton and Attorney Lindsay for CBS to finalize the Sand Supply Agreement.   During that meeting, Quisling made some redlined edits to the Agreement on his computer.   The parties dispute whether CBS was aware of these changes, but this dispute appears immaterial in light of the fact that the final version of the Agreement incorporates those edits and Brockinton signed the Agreement on CBS's behalf. Specifically, Quisling made the following change:

> The sum of $~~628~~ 157,000.00 shall be paid by Buyer to the Account designated by Seller no later than 2̶7̲ days after the Agreement Date.   Further payments shall be made to a designated Escrow Account, and both parties shall execute the Escrow Agreement attached hereto. ~~This Deposit consists of a prepayment for the first 20 rail car loads and the last 20 rail car loads~~ An additional $628,000 shall be paid to the Escrow Account within 7 days of the Agreement Date.

(Quisling Decl., Ex. 1 (dkt. #56-1) § 1.9; *see also* Quisling Decl., Ex. 2 (dkt. #56-2) § 1.9 (signed version with redlined edits incorporated).)

### ii.   Key Provisions of the Sand Supply Agreement

On January 13, 2015, GQ Sand as Seller and CBS as Buyer entered into the Sand Supply Agreement.   On behalf of their respective companies, Brockinton and Quisling

initialed each page of the Agreement and its incorporated Standard Terms and Conditions, then signed the Agreement. (Quisling Decl., Ex. 2 (dkt. #56-2).) The "Agreement Date" is expressly defined as January 13, 2015. Moreover, the Agreement states that it "shall be governed by and interpreted in accordance with the law of the State of Wisconsin." (*Id.* at § 9.)

In general terms, the Agreement requires GQ Sand to supply and CBS to purchase 30,000 tons of sand at $157 per ton "CIF," which is short for Cost, Insurance and Freight. The sand was to be delivered to Kress, Texas. CBS's plan was to then sell this sand to AST pursuant to their separate contract. That contract provided that AST would accept delivery of the sand from CBS at Kress.

More specifically, GQ Sand was to provide 10,000 tons each of 20/40, 30/50 and 40/70 grades of sand, with K-values of 7K, 9K and 9K, respectively. The Agreement gave GQ Sand the right to source its sand from any plant of its choosing so long as the sand met these specifications. The Agreement also requires that the sand meet minimum API standards as provided in "Exhibit B" to the Agreement, even though there is no attached Exhibit B. (*Id.* at § 1.11.) Finally, the Agreement provides that CBS, as the Buyer, "acknowledges that it has reviewed and has accepted the specification for Sand ('Specifications') and sampling procedures provided by Seller." (*Id.* at § 3(d).) (Although at his deposition, Brockinton admitted that he did not specifically remember requesting samples prior to entering the Agreement.)

The Agreement further binds GQ Sand to deliver the 30,000 tons of sand over four months in fifteen separate 2,000-ton deliveries. In turn, CBS is to make fifteen

payments into an escrow account of $314,000 per delivery, for a total of $4,710,000. This escrowed money, however, was only to be released as payment for the sand shipments upon the production of a "Disbursement Direction," which included attaching an invoice and manifest that GQ Sand was to send to both CBS and the escrow agent.[4] (Quisling Decl., Ex. 3 (dkt. #56-3) § 3.)

The "Commencement Date" for beginning scheduled deliveries is also defined as "January 15, 2015 or upon Sellers' receipt of the Deposit, if later." (Quisling Decl., Ex. 2 (dkt. #56-2) § 1.5.) As described above, § 1.9 of the Agreement contains the heading "Deposit."[5] The Agreement also allows for a "Ramp-Up Period," beginning on the Commencement Date and ending 15 days later. (*Id.* at § 1.8.) GQ Sand had no obligation to sell or deliver sand during the Ramp-Up Period.

Section 3(a)(i) requires GQ Sand to "use commercially reasonable efforts to accommodate the Delivery Date(s)." (*Id.* at § 3(a)(i).) If it could not meet the dates, GQ Sand was required to "notify Buyer of the reason for such inability," and then Seller and Buyer were required to "attempt to resolve such matters." (*Id.*) GQ Sand was also required to "use its best efforts to specify Delivery Dates at least ten (10) days" before delivery of the sand. (*Id.*)

---

[4] In this context, a manifest consisted of a list of a train's cars and their content. (CBS's Add'l PFOFs (dkt. #95) ¶ 4.)

[5] The Agreement also states that "Section headings contained in the Agreement are for reference only, and shall not in any way affect the meaning or interpretation of the Agreement." (Quisling Decl., Ex. 2 (dkt. #56-2) § 11(c).)

Finally, the Agreement sets forth the terms for termination.  Under Section 7(b) of the Standard Terms and Conditions, CBS had the ability to terminate the agreement, but only if GQ Sand accumulated more than three "Seller Uncured Failures" within a four month period.  The Agreement further requires CBS to promptly provide written notice of the failure to GQ Sand.  In the notice itself, CBS must also "specify the nature of such failure with particularity and in reasonable detail" and require reference to the relevant section of the Agreement.  (*Id.* at p.9.)  GQ Sand would then have ten days to cure the specified failure to perform.[6]

### C.  Rail Delivery Agreement

Around the same time GQ Sand and CBS were negotiating their Agreement for delivery of frac sand, Quisling was introduced by a mutual friend to Cody Lyon, the sole member of defendant RMS.  GQ Sand needed the ability to transport 30,000 tons of frac sand by rail, and RMS had the equipment and accounts to do so, including RMS's account with Union Pacific.

On December 22, 2014, Lyon sent Quisling an approximate schedule he had created for RMS to deliver 30,000 tons of sand from Tomah, Wisconsin, to Kress, Texas, over 15 weeks in 20-ton increments using 20 covered hopper railcars belonging to RMS.[7]

---

[6] GQ Sand directs the court to a definition of "Force Majeure" in the Standard Terms and Conditions, which are part of the Agreement, and in particular to a provision which states: "Seller shall not be liable for any failure or delay in performing its obligations hereunder when such failure or delay is primarily due to an event of Force Majeure."  (Quisling Decl., Ex. (dkt. #56-2) pp.4, 9.)  GQ Sand, however, fails to develop any argument based on this provision, perhaps out of recognition that such clauses are generally narrowly construed and rendered unenforceable absent language describing the specific circumstances under which it may excuse performance.

[7] The carrying capacity of a typical covered hopper railcar is 100 to 114 tons.

Defendant RMS does not dispute that Lyon sent such a schedule, but claims *inter alia* that:  (1) it was created to "chip away at a deal"; (2) it meant "absolutely nothing"; (3) it contained a disclaimer; and (4) it was "suggested and . . . approximate."  (RMS and NEJGID's Resp. to Pl.'s PFOFs (dkt. #104) ¶ 53.)  Even crediting these caveats, RMS has difficulty squaring even this very rough, approximate schedule with Lyon's representations about timing in his declaration submitted in opposition to GQ Sand's motion for summary judgment.

On January 20, 2015, RMS and GQ Sand signed the Rail Delivery Agreement. (Quisling Decl., Ex. 4 (dkt. #56-5).)[8]  That Agreement required RMS to deliver 20 covered hopper railcars to Tomah, Wisconsin, by January 26, 2015, and gave GQ Sand the right to use those cars, without limitation, on a month-to-month basis until terminated.  At his deposition, however, Lyon admitted that only 18 of the 20 railcars for which GQ Sand contracted were operational at the time of signing of the Agreement.

By its terms, GQ Sand was to pay a $15,000 security deposit to RMS within five days of their agreement, and an additional $15,000 per month for the use of the 20 cars. GQ Sand actually paid the security deposit on January 20, five days early.  In addition to these payments, GQ Sand was to pay $60.01 per ton in freight charges, $4.80 per ton in switching fees, and $1.95 per ton in waybilling[9] to RMS upon the delivery of the sand to

---

[8] The preamble of the Agreement contains the date January 19, 2015, but there is no dispute that it was entered into on January 20, 2015, as confirmed by the dates next to the parties' signatures. In any event, the difference between the two dates does not appear to be material.

[9] The waybilling fee is for administrative work of reconciling records, arranging staging/storing at rail sites, and managing a transloading process.

Kress, Texas.  It was RMS's responsibility to pay for the fees and cost of relocating and repositioning the railcars to their established origin and destination points.[10]

Under the Agreement, RMS was required to obtain a commercial insurance policy including contractual liability coverage with limits per occurrence of $3,000,000, with GQ Sand listed as an additional insured.  (*Id.* at § 6.2.)  RMS never obtained that insurance.  The Rail Delivery Agreement also requires RMS to indemnify GQ Sand for any losses and damages GQ Sand suffers as a result of RMS's breach of the agreement, the negligent acts or omissions of RMS or its agents, and/or the condition or operation of the railcars.  (*Id.* at § 6.1.)

### D. Wisconsin White Sand

On January 13, 2015, the day GQ Sand and CBS executed the Sand Supply Agreement, GQ Sand also signed a purchase order with Wisconsin White Sand, LLC ("WWS"), for 30,000 total tons of sand (10,000 each of the three grades required by the Supply Agreement).  CBS disputes whether GQ Sand intended to source all of that sand to CBS or to other purchases, pointing to Quisling's deposition testimony in which he stated that he was planning on sending a "portion" of sand from WWS to CBS.  (CBS's Resp. to Pl.'s PFOFs (dkt. #94) ¶ 83 (quoting 10/23/15 Quisling Depo. (dkt. #59) 44-45.)  This argument seems silly in light of the fact that GQ Sand had arranged to purchase sand from WWS exactly matching what CBS needed to fulfill its contract with ATS.  Regardless, this dispute is not material.

---

[10] The re-positioning of cars is also referred to as an "empty car move."

WWS in turn had a lease agreement with Allied Cooperative which provided WWS with non-exclusive use of Allied's land and premises for the receiving, staging, switching, loading and deploying of railcars from its rail terminal in Tomah, Wisconsin. (Brewer Decl., Ex. 4 (dkt. #55-4) § 3.)  On January 18, 2015, Bob Schenken, Director of Business Development for WWS, emailed Quisling about available origin locations to obtain rail quotes for both Canadian Pacific Railroads, also in Tomah, and Union Pacific Railroads.

The parties dispute when CBS, specifically Brockinton, was aware that at least some of the sand would be supplied by WWS.  CBS had previously purchased 1,000 tons of 40/70 sand from WWS, and therefore has some familiarity with the product.   On December 1, 2014, WWS's Schenken sent CBS's Brockinton information with test results for WWS's grades.  Those tests reveal that both the 30/50 and 40/70 grades had obtained a crush value of 9K.  CBS does not dispute this, but contends that the test results also showed that the 20/40 and 30/50 grades had 6K and 7K values, respectively. Also on December 1, Schenken emailed GQ Sand's Quisling with the same test results, along with an additional spreadsheet showing that the 20/40 grade had tested for a crush value of 7K.   Additional material from WWS to Quisling and Brockinton similarly showed crush values of 7K for the 20/40 grade and 9K for the 40/70 grade.  CBS persists in maintaining, however, that some of the materials showed values of 6K for the 20/40 grade and 7K for the 30/50 grade.

### E.  Post-Agreement Problems

Over the next month, GQ Sand encountered an escalating set of problems with both its Sand Supply Agreement with CBS and its Rail Delivery Agreement with RMS. With the benefit of hindsight, these problems were inevitable.  Starting in mid- to late-January 2015, the number of open hydrofracking sites in Texas dropped rapidly.  Within three weeks of the signing of the Sand Supply Agreement, the number of operational fracking sites in Texas dropped from approximately 740 to a little over 600, and by May 2015, the number of sites dropped by almost 50% percent, to 375.  As a result, the supply of frac sand exceeded demand and prices for frac sand began to fall.  Brockinton plausibly opined at his deposition that this market decline explained AST's decision not to honor its contract with CBS despite the fact that the contract between the parties contemplates fluctuating prices and allows for adjustments.  To appreciate the death spiral in which the parties' business deal was caught, the court details the problems encountered in chronological order, as did the parties, while interspersing developments in their efforts to procure both the sand and railcars.

After depositing $157,000 into GQ Sand's operating account on January 20, 2015, as required by the Sand Supply Agreement, CBS asked GQ Sand to verify receipt of the "deposit."  (CBS's Reply to its PFOFs (dkt. #123) ¶ 24 (citing Salman Decl., Ex. 5 (dkt. 77-5) 2).)  That same day, GQ Sand responded "[g]ot deposit…Rail cars moving today need to get escrow info to the bank today to get that process moving."  (*Id.* at ¶ 25 (citing Salman Decl., Ex. 5 (dkt. #77-5) 2).)

Also on January 20, shortly after signing the Rail Delivery Agreement, RMS's Lyon informed GQ Sand's Quisling that he was starting the empty railcar move from Colorado to Tomah, Wisconsin.  Despite this communication, Lyon learned on the same day from his Union Pacific contact that it did not serve the Allied Terminal in Tomah "at this time."  (Pl's Add'l PFOFs (dkt. #107) ¶ 230.)  Based on Lyon's original communication, however, Quisling informed CBS that the railcars were moving.  Quisling also confidently sent WWS the railcar numbers, which it could use to track the cars through a computer system.  Finally, on January 20, Brockinton informed GQ Sand that CBS's customer AST was "balking at taking the product for which it contracted with [CBS]."  (Pl.'s PFOFs (dkt. #51) ¶ 92.)

On January 22, GQ Sand's Quisling informed RMS's Lyon that there was trouble tracking the railcars.  According to an email exchange, despite knowing of the Union Pacific problem, Lyon told Quisling that he would not be able to track the railcars "until the destination is opened by the checkoffs" and that Lyon would take care of it, stating "a word to the wise, let me do my end."  (Pl.'s PFOFs (dkt. #51) ¶ 100 (quoting Quisling Decl., Ex. 7 (dkt. #56-7) 1).)[11]  On January 23, WWS's Schenken emailed Quisling to inform him that the railcars leased to GQ Sand by RMS were not appearing in the Union Pacific computer system.  That same day, Lyon informed Quisling that the cars were in Alomsa, Colorado.  Also on January 23, Brockinton called Quisling to let him know that CBS's customer AST would only be willing to take 5,000 tons of sand, rather than the

---

[11]The parties' raise several hearsay objections in responding to proposed findings of facts.  Here, as is true for the most part throughout, the claimed hearsay is a statement of a party opponent, which is not hearsay at all under Federal Rule of Evidence 801(d)(2).

30,000 tons promised.  Quisling offered to slow down the railcars so that CBS would have time to work things out with its customer or find another buyer; he also asked CBS's V.P. Brockinton to keep him apprised of any developments.

The parties dispute whether CBS agreed to GQ Sand's offer to slow down the shipments.  On January 26, Quisling and Brockinton spoke again, and Brockinton said that CBS had to get litigators involved with its customer.  Quisling again agreed to work with CBS and to wait for an alternative to emerge, at least until GQ Sand started to incur additional fees on the railcars.  CBS does not directly dispute this version of events, but again asserts that it never agreed to slow down shipments.  (*See* Brockinton Decl. (dkt. #97) ¶ 8.)

On January 28, the escrow agreement was signed.  On January 29, Brockinton texted Quisling asking him to send sand samples.  Quisling responded that it may take a day or two to obtain the samples.  Brockinton texted Quisling again with the same inquiry on February 2nd, 4th and 5th.  On or about February 5, Quisling sent Brockinton samples via overnight delivery.

On February 6, Brockinton received the samples.  That same day, CBS deposited $628,000 into the escrow account as required by the Supply Agreement.  GQ Sand maintains that after receipt of these samples, Quisling heard nothing from Brockinton. Although Brockinton testified at his deposition that he "believed" they had multiple phone conversations, he does *not* state that they discussed sand quality during any of those conversations.  (Pl.'s Reply to Pl.'s PFOFs (dkt. #128) ¶ 125.)  Also on February 6, RMS's Lyon informed Quisling that the railcars were in "Iowa somewhere," despite the

14

Agreement requiring that the railcars be in Tomah, Wisconsin, by January 26.  (Pl.'s PFOFs (dkt. #51) ¶ 113 (quoting Quisling Decl., Ex. 7 (dkt. #56-7) 2).)

Around this same time, WWS informed Quisling that despite its contract with Allied, Union Pacific had not yet granted WWS permission to load and ship out of Allied's terminal.  Without Union Pacific's permission, GQ Sand was not allowed to receive the 20 covered hopper railcars being sent by RMS.  During this time period, Schenken of WWS continued to press his contact at Union Pacific for approval.  Because of this concern as well as RMS's vague responses about the cars' locations, GQ Sand began to explore alternative sources for railcars and alternative locations to stage them.

On February 23, Union Pacific finally approved WWS for service one day a week, but only allowed it to move up to 10 cars per week in and out of the Allied facility.  As of that date, RMS had still not produced railcars at the Allied terminal as required by the Rail Agreement.  At the request of CBS, Hudspeth of defendant NEJGID sent Quisling a proposed release from the Supply Agreement that same evening (February 23) *and* proposed settlement stating in the email that "[t]his existing contract just does not make s[e]nse for anyone."  (Quisling Decl., Exs. 9, 10 (dkt. ##56-9, 56-10).)[12]

Hudspeth reports asking Quisling to sign the release and settlement documents, and then return them to him the next morning.  Material to the contract interpretation dispute between the parties, however, CBS points out that the release refers to GQ Sand

---

[12] CBS objects that this email and release is not admissible under Rule 408.  The court does not view the release as a settlement offer of a claim, and therefore it falls outside the scope of Rule 408.  Moreover, CBS itself relied on this document in *its* proposed findings of facts, while opposing GQ Sand's Rule 408 objection.

"returning payment of a security deposit" in the amount of a $137,000 (note, the deposit was $157,000) and releasing any claim to the $628,000 held in escrow.   (CBS's Add'l PFOFs (dkt. #95) ¶ 19 (citing Quisling Decl., Ex. 10 (dkt. #56-10) ¶ 4).)   On February 24, Hudspeth texted Brockington:   "BTW [your] release is coming.   We had a conversation last night.   Try not to notice the Kotex in his ass," to which Brockinton replied, "Ha. Josh just tried to call me."  (Pl.'s PFOFs (dkt. #51) ¶ 128.)

On the afternoon of February 24, Quisling responded to Hudspeth that he would not sign the release, detailing sunken expenses, including rail car fees and legal fees, but stating that he was "willing to work towards an amicable resolution."   (Pl.'s PFOFs (dkt. #51) ¶ 132 (citing Quisling Decl., Ex. 12 (dkt. #56-12)).)   Hudspeth responded the next day that he was "done being hel[d] hostage on accounts I bring you."  (Pl.'s PFOFs (dkt. #51) ¶ 136 (citing Quisling Decl., Ex. 12 (dkt. #56-12)).)

Also on February 24, Hudspeth forwarded to Quisling test results from the samples of sand Quisling had sent CBS earlier in February.   CBS had received the test results on February 14, and had sent them to Hudspeth on February 17.   According to CBS, the test results showed that some of the sand samples did not meet the specifications under the Sand Supply Agreement.   GQ Sand challenges the results on the basis that the test results do not identify the lab, the source of the material being tested, the procedures used, or otherwise indicate that certain standard tests were conducted.[13]

Also on February 24, Quisling asked Lyon whether it would be possible to switch the origin point of the railcars to the Canadian National line in Hixton, Wisconsin.  Lyon

---

[13] GQ Sand also points out that the lab that conducted the testing is not API or ISO certified.

responded via text, "if we go to Wyeville (Allied) that's cool, if we go to [Canadian National] that's cool too. Whichever. I'm good. Send the wire I guess." (Pl.'s PFOFs (dkt. #51) ¶ 134.) In response to this change of plans, RMS requested a rider to the Rail Delivery Agreement. On February 25, Quisling sent Lyon a draft of an amendment to the Rail Delivery Agreement which replaced Tomah with Hixton as the origin point. On February 26, RMS responded that the "Rider is coming. I nearly had to pull teeth to get it," but GQ Sand never received the rider, and no rider has been produced during the course of discovery. (Pl.'s Reply to Pl.'s PFOFs (dkt. #128) ¶¶ 166-67.) Also on February 26, at RMS's urging, Quisling paid the $15,000 payment for February despite the railcars not being used in February.

On February 25, CBS sent a right to cure letter to GQ Sand, stating that (1) it failed to deliver sand on five occasions and (2) attempted to deliver a product that did not meet specifications. (Pl.'s PFOFs (dkt. #51) ¶ 139 (citing Quisling Decl., Ex. 15 (dkt. #59-15)).)[14] The next day, on February 26, GQ Sand responded in writing to CBS's letter by challenging its claim of default, specifically pointing out deficiencies in the testing and that CBS had admitted in January that it was having issues with its customer AST. (Pl.'s PFOFs (dkt. #51) ¶ 158 (citing Quisling Decl., Ex. 16 (dkt. #59-16)).) Nonetheless, GQ Sand reiterated its ability to perform under the contract, representing that the railcars would be loaded and ready to depart within seven to ten days. With respect to the quality issue, GQ Sand also stated that it made arrangement

---

[14] GQ Sand also points out that CBS sent the letter to Hudspeth three hours before sending it to Quisling.

with a different supplier, Northern Frac, with sand that "will meet or exceed expectations." (*Id.*)

That same day, GQ Sand emailed Northern Frac to confirm that it was sending 20 covered hopper railcars to the Canadian National terminal in Hixton.  In response to GQ Sand's request, Northern Frac sent test results confirming that its sand met the specifications.  While pursuing improved performance, GQ Sand also sent an email on February 26, seeking a negotiated resolution and agreeing to put together the expenses GQ Sand had incurred to date.  (CBS's Add'l PFOFs (dkt. #95) ¶¶ 23-24 (Quisling Decl., Ex. 17 (dkt. #56-17)).)[15]  The letter also asked CBS to put "on hold" the notice of default and cure period, and sought written confirmation that the notice had been put on hold.

On February 28, Lyon informed Quisling via text message that the Canadian National locomotive was in Davenport, Iowa, and that he could arrange for it and the railcars to be in Merrillan, Wisconsin by March 3, 2015.  (Pl.'s PFOFs (dkt. #51) ¶ 78 (quoting Quisling Decl., Ex. 7 (dkt. #56-7) 5).)[16]  In response to Quisling's question, "So if I'm understanding you correctly the cars could be there by Tuesday [March 3]?," Lyon texted back the following, "Right.  And the move is free to Merri[llan] by way of Wisconsin Rapids.  No switch fees." (*Id.*)  Lyon later confirmed that all he had to do was file a release, which Quisling approved.  At his deposition, Lyon, however, testified that

---

[15] On February 27, Brockinton asked formally that GQ Sand send a breakdown of its expenses, so that they could discuss a resolution.

[16] From Google Maps, it appears that Merillan, Wisconsin is approximately 10 miles northeast of Hixton.

"[y]ou cannot get cars overnight moved up to Hixton on a [Canadian National] versus a [Union Pacific].  That mine is 48.1 miles away.  It'd take 10 days minimum."  (CBS's Resp. to Pl.'s PFOFs (dkt. #94) ¶ 179 (quoting 11/19/15 Lyon Depo. (dkt. #62) 87).)

On March 2, Quisling sent a letter to CBS listing GQ Sand's expenses.  (Quisling Decl., Ex. 18 (dkt. #56-18).) CBS took issue with several of the categories of expenses on the basis that GQ Sand did not incur the expense (*e.g.*, empty car move) or that the number stated exceeded the amount actually incurred (*e.g.*, $60,000 rather than $45,000 for railcars).  In that letter, Quisling also acknowledged that CBS had not withdrawn its notice of default and reiterated that it "continued to make arrangements to provide [] the material according to the contract," and included excerpts from the Northern Frac tests showing his access to sand that met CBS's specifications.  (*Id.*)  Finally, the letter stated that it would accept $185,000 to terminate the Sand Supply Agreement.  (*Id.*)

On March 2, RMS's Lyon also reiterated the need for GQ Sand to make its March lease payment, conveying again that RMS would execute a rider to the original Rail Agreement, and that Lyon would work to get the track agreement in place.  On March 2, Lyon stated that "[Canadian National] will switch [Union Pacific] at 1500 1st north.  CN rep. will get us in system there."  (Pl.'s PFOFs (dkt. #51) ¶ 187 (quoting Quisling Decl., Ex. 7 (dkt. #56-7) 10).)

On March 2, GQ Sand also emailed CBS a letter, which acknowledged that:  (1) CBS had not withdrawn its notice of default; and (2) it was continuing to make arrangements.  On March 4, GQ Sand, through counsel, sent a letter to CBS, explaining its view that GQ Sand had no obligation to deliver sand until February 23, 2015, and

therefore GQ Sand did not have three uncured failures to trigger CBS's right to cure notice.  (Pl.'s PFOFs (dkt. #51) ¶ 193 (citing Quisling Decl., Ex. 19 (dkt. #56-19)).) That same day, Hudspeth emailed Quisling to "put your seat belt on the ride is going to get [rough] from here."  (Pl.'s PFOFs (dkt. #51) ¶ 194 (quoting Quisling Decl., Ex. 20 (dkt. #56-20)).)  On March 4, CBS responded, through counsel, stating its position that the Commencement Date under the Supply Agreement was January 20, 2015, and, therefore, GQ Sand had failed to make three timely deliveries.  (*Id.* at ¶ 195 (quoting Quisling Decl., Ex. 21 (dkt. #56-21)).)  The court addresses this dispute below.

Despite having no railcars, on March 3, GQ Sand proceeded to repay the $15,000 monthly leasing fee for March to RMS.  The railcars did not arrive in Hixton on March 3 or at any other time.  Quisling asked Lyon about the status of the cars on March 3, but received no response.  On March 4, Quisling inquired again, and Lyon responded:  "I have fax confirmed Railcar numbers associated with new insurance binder.  I will be [o]n it first thing."  (Pl.'s PFOFs (dkt. #51) ¶ 192 (quoting Quisling Decl., Ex. 7 (dkt. #56-7) 13).)

On March 5, Quisling again sent Lyon a text, this time inquiring about the status of the railcars.  Lyon responded that Quisling should check his email.  Lyon also sent a letter to Quisling, CBS, and NEJGID, in which he required GQ Sand to pay RMS $3,510 in lost waybilling revenue, $2,016 in demurrage fees, $42,374 as a contribution for the empty car move and an additional $62,900 to make whole the terms of the Rail Delivery Agreement.  (Pl.'s PFOFs (dkt. #128) ¶¶ 201-02 (citing Quisling Decl., Ex. 22 (dkt. #56-

22)).)   The letter also required GQ Sand and RMS to draft a *new* Rail Delivery Agreement.

On March 6, Quisling asked if the cars would arrive that day.  Lyon responded via text, "$100,000 deposit required" and that he did not "[t]rust the stability and remains of the [CBS] contract."  (*Id.* at ¶ 204 (quoting Quisling Decl., Ex. 7 (dkt. #56-7) 14).)  Later on that same day, Lyon texted Quisling that he had spoken with Conley and Hudspeth and that "they want me to send the money to them."  (*Id.* at ¶ 205 (quoting Quisling Decl., Ex. 5 (dkt. #56-5) 14.)[17]  Brockinton averred in a declaration that CBS never requested Lyon to send it the money.  (CBS's Resp. to Pl.'s PFOFs (dkt. #94) ¶ 205 (citing Brockinton Decl. (dkt. #97) ¶ 8).)

On March 7, CBS sent an email to GQ Sand stating that it had failed to cure, at which point, *CBS* considered the Sand Supply Agreement null and void.  (Pl.'s PFOFs (dkt. #51) ¶ 212 (citing Quisling Decl., Ex. 25 (dkt. #56-25)).)  CBS also asked the escrow agent to hold the money, and stated it would call Monday to discuss return of the funds.[18]

---

[17] Lyon clarified at his deposition that he was referring to the $15,000 lease payment GQ Sand paid in March.

[18] Also in early March, GQ Sand was arranging purchase of sand from Muskie Proppants.  On Sunday March 8, Muskie sent GQ Sand a document called "Manifest," which indicated that the loading of the sand would not take place until March 18 and March 20.  (Conley's Add'l PFOFs (dkt. #95) ¶¶ 33-34 (citing Salman Decl., Ex. 7 (dkt. #77-7) 5).)  Because of this timing, Conley contends that GQ Sand could not have used Muskie to cure its previous defaults.  (*Id.* at ¶ 36.)

### F.  Relationship between Defendants

In addition to some of the facts described above, plaintiff proposes additional facts supporting its claims for tortious interference with a contract, fraud and conspiracy; the latter two, however, are not yet before the court at summary judgment.  (Dkt. #218.) Nonetheless, for the sake of completeness, the court sets forth these facts as well.

At some point, Hudspeth, the sole member of defendant NEJGID, and Conley, the President of defendant CBS, spoke about the location of GQ Sand's railcars. Hudspeth then provided Conley with contact information for Lyon, defendant RMS's sole member.

On or about February 25, Conley telephoned Lyon.  Before that call, Lyon had never spoken with Conley.  In that phone call, Lyon and Conley discussed the "legal letters to cure [and the] frustrating phone calls between parties."  (Conley's Resp. to Pl.'s PFOFs (dkt. #128) ¶ 149 (quoting 11/19/15 Lyon Depo. (dkt. #62) 74-75)).)  Conley learned from Lyon that GQ Sand had contracted for 20 railcars, which Brockinton did not, in his limited knowledge, believe to be enough.  At some point, but not necessarily during the February 25 call, Conley mentioned the possibility of working with Lyon on a Fort Stockton deal.  Two days prior to this call, Brockinton and Hudspeth had also texted about a Fort Stockton deal.

On February 26, Lyon sent Hudspeth a draft of a letter addressed to Quisling, one of GQ Sand's two members.  Hudspeth, in turn, forwarded the draft letter to CBS the next day.  In the letter, Lyon purported to alter some of the terms of the Rail Delivery Agreement, shifting the cost of repositioning the railcars to GQ Sand and requiring

payments in excess of $125,000, including a $100,000 deposit. (Watt Decl., Ex. 7 (dkt. #57-7).) Lyon also noted that "the contracted parties are wavering on completing of implementation of the project and overall contract," and that it was "not true" Allied was prepared to receive the railcars, and therefore "based on delays not by any fault of my own, I was not able to bill my regular wages . . . ." (*Id.*)

Immediately after sending the letter to Hudspeth, Lyon left the following voicemail for Conley at CBS:

> Mr. Conley, this is Cody Lyon in Dallas. I did strike up a letter to Josh [Quisling]. It's in draft format. It's in pdf format so it can't be changed. Carl [Hudspeth] has a copy of it. You need Carl to send it to Brock [Brockinton] and Brock can forward it to you. But it is hot off the press. It's ready to go. I will not send it out until you guys tell me to send it out. Okay? So that's how I operate. We'll go from there. So it's done. It's ready to go. You guys can proofread it. You can make changes to it, do whatever you want to do. I won't send it out until you guys give me direction. Okay. Bye.

(Pl.'s PFOFs (dkt. #51) ¶ 172 (quoting Watt Decl., Ex. 6 (dkt. #57-6)).)

On February 27, Conley responded through a text message, "Don't send it [until] we get back to you. Thanks. Rory Conley." (Pl.'s PFOFs (dkt. #51) ¶ 173 (quoting Watt Decl., Ex. 8 (dkt. #57-8)).) Lyon sent a follow-up text to Conley on February 28, but he never responded. Neither Quisling, nor anyone else at GQ Sand, ever received the letter until it was produced during discovery, though Quisling did receive a March 5 letter from Lyon as detailed above.

Later in March, in a text message to Brockinton, Lyon described the February 25 phone call with Rory Conley as: "Mr. Rory Conley contacted me, he called me (I didn't call him), Carl [Hudspeth] was listening on the same call, and Rory asked 'that my

Railcars not make it to Josh [Quisling]' . . . ."  (Pl.'s PFOFs (dkt. #51) ¶ 154 (quoting Watts Decl., Ex. 9 (dkt. #57-9) 3).)   Lyon confirmed this account at his deposition, though Conley submitted a declaration in opposition to GQ Sand's motion for summary judgment in which he avers, "I never told Cody [Lyon] not to send the rail cars to GQ Sand."  (Conley's Resp. to Pl.'s PFOFs (dkt. #128) ¶ 154 (quoting Rory Conley Decl. (dkt. #96) ¶ 13).)[19]

In text exchanges between Lyon and Brockinton, Lyon also represented that Hudspeth had told him that without the [CBS] deal, GQ Sand "couldn't pay for anything."  (Pl.'s PFOFs (dkt. #51) ¶ 156 (quoting Watt Decl., Ex. 9 (dkt. #57-9) 3).)  Lyon further stated in a separate text that "when [CBS] got involved it was about not helping Josh cure [by] any means.  Even curing by a percentage."  (Pl.'s PFOFs (dkt. #51) ¶ 157 (quoting Watt Decl., Ex. 9 (dkt. #57-9) 3).)

Also in late February, Lyon and Conley exchanged text messages in which Conley offered Lyon a "soft deal," specifically mentioning that he was meeting with the owners of rented warehouses in Plainview, Texas.  (Pl.'s PFOFs (dkt. #51) ¶¶ 219-20 (quoting Watt Decl., Exs. 8, 9 (dkt. ##57-8, 57-9)).)  On March 9, 2015, Brockington and Lyon texted about forming a corporation with three members -- defendants CBS, RMS and

---

[19] GQ Sand objects to Conley's declaration and others as "not substantially in the form required by 28 U.S.C. § 1746.  Conley declares under penalty of perjury and the declaration is dated and signed, thus satisfying the requirements of § 1746.  Still, in its reply brief, GQ Sand argues that "the substantive statement regarding the statement being 'under penalty of perjury' and the information being 'true and correct' is detached from the date and signature," thus raising questions as to whether the declarant read and understood the consequences of signing the declaration.  (GQ Sand's Reply (dkt. #127) 30.)  The court does not read § 1746 to require such an exacting obligation, and assumes that CBS's counsel insured Conley intended to aver to the truth of everything in his declaration.  If not, the consequences would be dire for anyone involved.

NEJGID -- to work on a deal in Plainview involving shipping frac sand to warehouses in Plainview for easy distribution at nearby sites in Texas.  On March 10, Lyon even emailed Hudspeth and Conley a flow chart of a proposed ownership structure and ideas on how the business would operate.

In yet another text message among defendants sent on March 26, Lyon stated, "If you are not going to do anything let me know?  You folks called me, asking me for assistance, I help, now getting info. from you is difficult and challenging?  If you are not planning a business concept, please advise?"  (Pl.'s PFOFs (dkt. #51) ¶ 216 (quoting Watt Decl., Ex. 9 (dkt. #57-9) 2.)  Brockinton testified at his deposition that he was not sure what Lyon was talking about in his text message.  Regardless, in response, Brockinton advised that Lyon "tread softly," and Lyon pressed that he would not give up this deal without having another in place.  (*Id.*)

### G. Nominal Defendant

Plaintiff GQ Sand filed the present lawsuit on March 9, 2015.  In June 2015, upon stipulation of all parties, nominal defendant Associated Trust Company, N.A. paid the $627,000 held in escrow into the court and was relieved of any further participation in this suit.  (Dkt. #30.)

### OPINION

Since plaintiff GQ Sand seeks summary judgment on claims for which it bears the burden of proof, it "must lay out the elements of the claim, cite the facts [that] it believes

satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim." *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015); *see also Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.*, 971 F.2d 37, 42 (7th Cir. 1992) ("[B]ecause Owens-Corning and CertainTeed also have the burden at trial of establishing good faith, they must establish affirmatively the lack of 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986))).  "If the movant has failed to make this initial showing, the court is obligated to deny the motion." *Hotel 71 Mezz Lender LLC*, 778 F.3d at 601; *see also Johnson v. Hix Wrecker Serv., Inc.*, 651 F.3d 658, 662 (7th Cir. 2011) ("A party opposing summary judgment does not have to rebut factual propositions on which the movant bears the burden of proof and that the movant has not properly supported in the first instance.").  Given this high burden, it is perhaps unsurprising that plaintiff's motion will be denied for all but its claims of negligence and misrepresentation against RMS, and a grant of partial summary judgment on its claim that RMS breached the Rail Service Agreement by failing to secure insurance.  Defendant CBS's burden is obviously low with respect to its motion for summary judgment on on GQ Sand's claims.  CBS is entitled to summary judgment if no rational jury or trier of fact could find for GQ Sand as the non-moving party, even when all inferences are drawn in the non-moving party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 599 (1986). Even so, CBS's motion will also be denied.

26

### I.  GQ Sand's Contract Claim against RMS

"The elements for a breach of contract in Wisconsin are familiar; the plaintiff must show [1] a valid contract that [2] the defendant breached and [3] damages flowing from that breach." *Matthews v. Wis. Energy Corp.*, 534 F.3d 547, 553 (7th Cir. 2008) (citing *Nw. Motor Car, Inc. v. Pope*, 51 Wis.2d 292, 296, 187 N.W.2d 200 (1971)). There appears no dispute that the Rail Services Agreement is a valid contract, nor could there be given the undisputed facts here.  As such, GQ Sand's claims turn on whether RMS breached that contract.  GQ Sand maintains that RMS breached the Rail Services Agreement in two respects: (1) by failing to secure the required insurance policy; and (2) by failing to supply railcars as required under the Agreement.

As for the *first* breach, RMS does not dispute that it failed to purchase the required insurance.  In his declaration, however, Cody Lyon offers a rambling explanation for failing to do so.  (Lyon Decl. (dkt. #120) ¶ 33.)  Even if credited, his explanation does not constitute a defense to GQ Sand's breach of contract claim.

The more interesting question, although not briefed by the parties, is whether RMS's breach was material or just a technical breach, since the latter only opens the door to nominal damages.  *See generally* II Michael B. Apfeld *et al.*, *Contract Law in Wisconsin* § 12.18 (4th ed. 2013).  While the court will grant GQ Sand partial summary judgment as to this claim, whether the breach is material and, if so, the appropriate relief for the breach will have to await trial.  *Epic Sys. Corp. v. Tata Consultancy Servs. Ltd.*, No. 14-CV-748-WMC, 2016 WL 845341, at *21-22 (W.D. Wis. Mar. 2, 2016) (granting summary judgment to plaintiff on certain breach of contract claims, but leaving questions of any

27

injury and resulting damages for jury trial); *Ralph Gentile, Inc. v. State Div. of Hearings &* *Appeal*, 2011 WI App 98, ¶ 5, 334 Wis. 2d 712, 800 N.W. 2d 555 ("Whether a party to a contract has committed a 'material breach' of that contract, however, is a question of fact.").

Understandably, the parties' focus is on the *second* alleged breach -- that RMS failed to provide the railcars as required by the contract. As an initial matter, it is undisputed that railcars were never delivered to GQ Sand for its use. Still, RMS pursues a counterclaim for breach of contract, which could also be a defense to GQ Sand's claim, positing two core arguments: (1) GQ Sand breached first by failing to perform; and (2) even if RMS breached, GQ Sand could not have performed. The latter would at least call into question GQ Sand's entitlement to damages.

As for the first defense, GQ Sand's only obligation under the contract was to pay money, which it did. In fact, GQ Sand paid the initial $15,000 security deposit on January 20, 2015, the same day the parties entered into that Agreement and five days before it was due. Nor is it disputed that GQ Sand paid $15,000 in both February and March as called for by the contract to cover the monthly service fees of "$750.00 per month per rail car," assuming the provision of 20 railcars, despite RMS failure to provide such railcars. Finally, GQ Sand's other payment obligations were all tied to the transport of sand (*e.g.*, freight charges, waybilling and switching fees), and since no transport ever occurred, there is also no dispute that none of the payment obligations accrued either.

In the face of this seemingly overwhelming and undisputed evidence, RMS first appears to argue that GQ Sand also had an obligation to secure the origin location.

28

RMS, however, fails to direct the court to any provision requiring GQ Sand to secure such a location.  While the Allied Rail Terminal in Tomah, Wisconsin, is identified in the Agreement, RMS was in the best position to determine whether that location was workable.  Indeed, RMS learned the very day it signed the contract that Union Pacific did not serve the Allied Terminal in Tomah at the time.[20]  In contrast, there is nothing in the record to indicate that Lyon informed GQ Sand that this location would pose a significant problem.  Instead, the record reflects that when GQ Sand's Quisling sought additional information about the location of the railcars, Lyon informed him in a text message that he should "let me do my end."  (Pl.'s PFOFs (dkt. #51) ¶ 100 (quoting Quisling Decl., Ex. 7 (dkt. #56-7) 1).)  Indeed, Quisling apparently was not aware of the difficulties at the Allied Terminal until February 6 when he was informed of the issue by his contact at WWS.  Accordingly, not only does the contract contain no express obligation on GQ Sand to secure the origin location, the parties' course of conduct demonstrates that it was *RMS* who had taken responsibility for the location, and despite knowledge of a problem, *still* informed GQ Sand that RMS was responsible for placing the railcars in position at the origin location.

Even assuming GQ Sand breached a duty to provide an origin location, there would still be fact issues regarding whether that failure caused RMS's alleged inability to

---

[20] RMS asserts a counterclaim against GQ Sand for "misrepresentation/negligence/breach." (RMS's Answer & Counterclaim (dkt. #24) ¶¶ 124-28.)  GQ Sand also moved for summary judgment on this counterclaim.  (GQ Sand's Opening Br. (dkt. #52) 7.)  RMS failed to respond to the misrepresentation or negligence claim.  Even if it had responded, any misrepresentation or negligence on the part of GQ Sand based on the availability of the Allied Terminal is interwoven with the contract, and therefore would be barred by the economic loss doctrine.  *See Kaloti Enters., Inc. v. Kellogg Sales Co.*, 2005 WI 111 at ¶ 42, 283 Wis.2d 555, 699 N.W.2d 205 (2005).

perform.  In support of RMS's apparent position, that GQ Sand's breach excused its performance, RMS claims in its opposition brief to have "had its rail cars in position to move them to Tomah, Wisconsin, if the restrictions on the rail yard would have been cleared." (RMS's Opp'n (dkt. #101) 16.)  Even so, RMS cites no factual support for this contention.  If anything, the undisputed facts demonstrate that the railcars were not even in Wisconsin.  On February 6, 2015 -- eleven days after the railcars were to have been in position in Tomah -- Lyon informed Quisling that the railcars were in "Iowa somewhere." (Quisling Decl., Ex. 7 (dkt. #56-7) 2.)  Moreover, on February 23, 2015, when Union Pacific approved ten railcars at the Allied Terminal, RMS still failed to place those 10 railcars in position at the Tomah station, though, by that point, the parties were considering changing the location to Hixton.  In light of this evidence, RMS's position that it was ready to perform, but simply could not do so because of issues at the Allied Terminal in Tomah is suspect at best.

RMS also argues that the demand for a change of the origin location from Tomah to Hixton constituted a breach of the Agreement or otherwise excused RMS's performance.  Even assuming that RMS was in a position to perform, and would have performed, but for problems with the origin location, the record demonstrates that RMS acquiesced to GQ Sand's request for a change in that location.  In response to GQ Sand's inquiry about switching the original location to Hixton, Wisconsin, Lyon responded in a text message:  "[i]t sounds like if we go to Wyeville [Allied Terminal,] that's cool, if we go to [Canadian National,] that's cool too.  Whichever.  I'm good." (Quisling Decl., Ex. 7 (dkt. #56-7) 3.)  On February 25, RMS further indicated that it would sign a rider

amending the Rail Delivery Agreement, and on February 28, RMS told GQ Sand that the cars would be in Hixton on March 3.[21]

Finally, RMS contends that GQ Sand was not *injured* by any breach by RMS, because it cannot demonstrate that it "could have timely performed its obligations but for RMS being prevented from delivering the Railcars." (RMS's Opp'n (dkt. #101) 18.) In essence, RMS is arguing that its performance should be excused because GQ Sand could not have performed its obligations under a *separate* contract, the Sand Supply Agreement. In particular, RMS asserts that GQ Sand did not have frac sand ready for delivery to Texas under the Sand Supply Agreement. Assuming this was so, GQ Sand's *damages* as the result of RMS's breach would be less (really, just the payments made under their contract), but RMS cites no case that would relieve it of performance simply because a chain of later events would not occur consistent with a separate contractual arrangement. To the contrary, the cases cited by RMS illustrate that the proper inquiry is whether, in the absence of a breach, the party allegedly injured by the breach could perform its obligation under the parties' own contract. (*See* RMS'S Opp'n (dkt. #101) 18 (citing cases all concerning whether party could perform under the contract at issue).)[22]

---

[21] In the March 5 letter, RMS appears to change positions, demanding additional money to provide the promised railcars, but plaintiff has significant evidence to support a finding that defendants CBS and NEJGID were behind this new demand.

[22] Perhaps, GQ Sand's ability to perform under the Sand Supply Agreement will be material to GQ Sand's damages claim. In other words, if the jury were to find that GQ Sand could not have performed under the Sand Supply Agreement due to sand quality issues, than GQ Sand's injury would be unrelated to RMS's breach and, therefore, RMS would have no duty to indemnify GQ Sand for its damages.

Critically, GQ Sand need not have delivered *any* sand to meet its obligations under the Rail Delivery Agreement.  As described above, there is no dispute that GQ Sand could perform -- and indeed, did perform -- under the Rail Delivery Agreement simply by providing the promised payments.  If anything, RMS's reliance on GQ Sand's ability to perform under the Sand Supply Agreement lends support to its motivation not to perform, as well GQ Sand's tortious interference with a contract claim, and perhaps its related fraud and conspiracy claims.

Despite the record evidence pointing strongly in favor of GQ Sand's position that RMS breached the contract by failing to place railcars in position as required under the Agreement, there remains at least an arguable issue of material fact as to whether the problems with the Allied location somehow excused RMS's performance, which could conceivably turn on credibility.  Although this court is dubious of even that possibility, the jury will have to hear all of these facts for purposes of deciding GQ Sand's tortious interference claim, as well as deciding its damages for breach of contract.  Given the somewhat muddled record, and the lack of any efficiency in deciding the issue before trial, the court is inclined to deny judgment on this breach of contract claim, although it will hear further oral argument on this claim at the Final Pretrial Conference.  Moreover, the jury will need to determine whether RMS's failure to secure insurance constitutes a separate, material breach.

## II.   GQ Sand and CBS' Respective Breach of Contract Claims

GQ Sand and CBS assert cross-claims for breach of contract.  GQ Sand alleges that CBS breached the Sand Supply Agreement by purporting to find GQ Sand in default, then serving a notice of right to cure letter without the grounds to do so, and finally terminating the contract based on GQ Sand's claimed failure to cure.   For its part, CBS contends that GQ Sand breached the Agreement by failing to deliver sand and by failing to meet sand specifications set forth in the Agreement.

### A.  Meaning of "Deposit"

As described above, the Agreement contemplates that GQ Sand will deliver sand on a weekly basis following the payment of a deposit and a fifteen-day ramp-up period. CBS's February 25th right to cure defect letter listed as grounds for default (1) GQ Sand's failure to deliver sand on five occasions and (2) its attempt to deliver a product that did not meet specifications.

The parties' dispute over GQ Sand's claimed failure to deliver frac sand timely centers on what constitutes a "deposit," thus triggering GQ Sand's performance.  There is no dispute that the Agreement defines the "Commencement Date" as "January 15, 2015 or upon Sellers' receipt of the Deposit, if later," and that it further provides for a "Ramp-Up Period," defined as "[t]he period beginning on the Commencement Date and ending on 15 days thereafter, subject to extension by Seller as provided in the Standard Terms." Instead, CBS argues that its January 20th, $157,000 payment to GQ Sand constituted the "deposit," which then triggered GQ Sand's performance; while GQ Sand contends

that the "deposit" consists of *both* the $157,000 payment and the February 6th, $628,000 deposit into the escrow account.

Wisconsin applies familiar rules of contract interpretation to determine the intent of the parties.  *See Town Bank v. City Real Estate Dev., LLC*, 2010 WI 134, ¶ 33, 330 Wis. 2d 340, 793 N.W. 2d 476 ("[T]he best indication of the parties' intent is the language of the contract itself[.]")  In reviewing this language, the court must strive "to give meaning to every word, 'avoiding constructions which render portions of a contract meaningless, inexplicable or mere surplusage.'"  *Maryland Arms Ltd. P'ship v. Connell*, 2010 WI 64, ¶ 45, 326 Wis.2d 300, 786 N.W.2d 15 (citation omitted).  "[A] contract provision is ambiguous if it is fairly susceptible of more than one construction."  *Mgmt. Comput. Servs., Inc. v. Hawkins, Ash, Baptie & Co.*, 206 Wis. 2d 158, 178, 557 N.W.2d 67 (1996) (citations omitted).  In that case, the provision "must be construed by the use of extrinsic evidence [and] the question is one of contract interpretation for the jury."  *Id.*  Such extrinsic evidence may include "the conduct of the parties and negotiations which took place, both before and after the execution of the documents, and . . . all related documents of the parties."  *Smith v. Osborne*, 66 Wis. 2d 264, 272, 223 N.W.2d 913, 917 (1974).

The only reference to "Deposit," other than its use in the definition of "Commencement Date," is the heading of § 1.9.  The actual language of that section, however, does *not* contain the word "deposit," but rather it describes the two payments referenced above -- the $157,000 payment to GQ Sand and the $628,000 payment to the escrow account.  Still, given the reference to "Deposit" in the heading of § 1.9, the

court would be inclined to interpret the Agreement to mean that both payments constitute the "deposit."  The Agreement, however, also states that "Section headings contained in the Agreement are for reference only, and shall not in any way affect the meaning or interpretation of the Agreement."  (Quisling Decl., Ex. 2 (dkt. #56-2) p.11.)

Without relying on this heading reference, the court is hard-pressed to find sufficient *intrinsic* evidence to interpret the meaning of "Deposit" in the Commencement Date provision.  Moreover, the plain meaning of "deposit," specifically a security deposit, as "money placed with a person as earnest money or security for the performance of a contract," Black's Law Dictionary (9th ed. 2009) (definition of *Deposit*), does not resolve the issue either.  Accordingly, the term is susceptible to more than one construction and, therefore, it is ambiguous.

The parties point to certain *extrinsic* evidence in support of their respective constructions as well, but that evidence also is inconclusive, or at least not so one-sided as to allow the court to conclude that a reasonable jury would necessarily adopt one of the two positions.  The pre-contract evidence appears to support GQ Sand's position.  In an earlier draft, the "deposit" was expressly defined as a $628,000 payment from CBS directly to GQ Sand.  The change from that earlier draft -- requiring payment into an escrow account -- apparently was made to address CBS's concern about paying that large sum of money directly to GQ Sand in advance of performance.  GQ Sand agreed to this change, conditioned on an additional payment of $157,000 payment directly to GQ Sand to allow it access to immediate funds to cover upfront costs.  Certainly, these changes do not appear to modify the parties' apparent intent that CBS would pay a large

sum of money at the commencement of the agreement to cover the first and last shipments.  As such, the pre-contract extrinsic evidence supports GQ Sand's position that the deposit consists of both payments.

The post-contract extrinsic evidence, however, arguably paints a different picture. After the January 20th payment of $157,000 to GQ Sand, CBS asked GQ Sand to verify receipt of the "deposit."  (CBS's Reply to its PFOFs (dkt. #123) ¶ 24 (citing Salman Decl., Ex. 5 (dkt. 77-5) 2).)  GQ Sand responded the same day with, "[g]ot deposit…Rail cars moving today need to get escrow info to the bank today to get that process moving." (*Id.* at ¶ 25 (citing Salman Decl., Ex. 5 (dkt. #77-5) 2).)  From this, a reasonable jury *might* find that the GQ Sand viewed the $157,000 payment as the deposit, triggering its obligations under the contract.  While this still seems a stretch, especially since GQ Sand also referenced the required escrow account payment in that same communication, a jury will need to consider the extrinsic evidence in resolving the parties' dispute as to the appropriate construction of "deposit."  *See Mgmt. Computer Servs., Inc.*, 206 Wis. 2d at 178.

### B.  Other Issues with Notice

Even if the jury were to adopt CBS's less plausible interpretation of "deposit," GQ Sand contends that CBS's notice of right to cure default was defective because there was no default.  Assuming that the $157,000 payment on January 20, 2015, triggered performance, and taking into account the 15-day ramp-up period which would have ended on February 4, 2015, GQ Sand argues that it only missed *three* deliveries: (1) for the week of February 5-11, (2) for the week of February 12-18, and (3) for the week of

February 19-25.[23]  In contrast, CBS's February 25 letter asserts that GQ Sand had missed *five* deliveries.  If GQ Sand's count were correct, the failure to timely deliver could not serve as a basis for CBS's termination of the Agreement.  This factual dispute is also unfortunately one for the jury to resolve.

GQ Sand also argues that even the breach of five untimely deliveries would not have been material since time was not of the essence.  *See Wauwatosa Realty Co. v. Bishop*, 6 Wis. 2d 230, 237, 94 N.W.2d 562, 566 (1959) (explaining that delay in performance justifies rescission of the contract only when time is of the essence) (quoting *Zuelke v. Gergo*, 258 Wis. 267, 271, 45 N.W.2d 690, 692 (1951)).  This latter argument is contradicted by the language of the Agreement itself, the Agreement's schedule of deliveries, and the provision permitting termination of the Agreement if GQ Sand fails to meet its obligations under the contract.  *See* II Michael B. Apfeld *et al.*, *Contract Law in Wisconsin* § 12.15(c) (4th ed. 2013) ("That the contract sets a specific time or date for performance is not conclusive, absent a further provision concerning the effect of nonperformance at the time stated.") (citing *Haislmaier v. Zache*, 25 Wis. 2d 376, 381, 130 N.W.2d 801 (1964)).

Again, however, even the language of the Agreement does not resolve *fully* this issue.  This is because the provision permitting termination may be waived by the party benefited by it.  *See M & I Marshall & Ilsley Bank v. Pump*, 88 Wis. 2d 323, 330, 276 N.W.2d 295, 298 (1979).  Here, a reasonable jury could find that CBS waived any "time

---

[23] The schedule contemplates delivery within a seven day period, so plaintiff's construction of the delivery occurring on the last day of that seven day period is reasonable.

is of the essence" requirement by (1) notifying GQ Sand that its customer was balking at the planned 30,000 ton delivery and (2) not requesting delivery at any time after that date (even if it did not expressly agree to GQ Sand's offer to slow down).

Similarly, if the jury finds GQ Sand missed just three deliveries, that is not enough to find GQ Sand in default under the Agreement, which specifically requires that GQ Sand have "*more than* three Seller Uncured Failures" before CBS would have the right to terminate the contract.  (*See* Quisling Decl., Ex. 2 (dkt. #56-2) 9 (emphasis added).)  As such, CBS must rely on assertion of defects in sand quality to bring the number of failures up to four, and thus justify its termination of the Agreement.  The right to cure letter provides that GQ Sand breached the contract by "attempt[ing] to provide a product that does not meet the API requirements set forth in the agreement."  (Quisling Decl., Ex. 15 (dkt. #56-15) 2.)  The letter does not set forth a specific provision of the contract, as required by the relevant failure to perform provision in the Agreement.  Moreover, an *attempt* to source a non-conforming product does not constitute a breach of the agreement here since, as GQ Sand points out, the warranty section of the contract provides that "seller warrants only that the sand will comply with the specifications in all material respects at the time of tender of delivery to buyer."  (Quisling Decl., Ex. 2 (dkt. #56-2) 13 (all capitalizations omitted).)[24]

In addition, GQ Sand has raised genuine issues of material fact as to:  whether CBS's testing was legitimate; whether CBS acquiesced to GQ Sand sourcing the product through WWS based on CBS's prior experience with that sand (or by failing to secure

---

[24] Perhaps this could be construed as a finding of "anticipatory breach," except for the fact that GQ Sand could only breach if it were unable to cure.  *See* discussion *infra*, III.C.

samples prior to executing the Agreement); and whether CBS's withholding of its test results for over two weeks renders the notice untimely (i.e., not "prompt") under the relevant provision of the Agreement.   GQ Sand also raises other procedural challenges with respect to the February 25th notice of right to cure:  whether the notice was defective because CBS "stacked" the various violations into one notice, rather than detailing them in separate notices; whether CBS's failure to detail each delivery failure in a separate notice means that the notice was not "prompt"; and whether CBS's failure to reference specific provisions of the Agreement also undermines the effectiveness of the notice.

All of these issues are more properly addressed by a jury in the first instance.

### C.  GQ Sand's Ability to Perform

Similar to RMS's defense above, CBS argues that even if its notice of right to cure default was premature, its termination of the Agreement was justified because GQ Sand was not *capable* of performing under the Agreement.  In order to rely on a repudiation or anticipatory breach claim, there must be a "definite and unequivocal manifestation of intention on the part of the repudiator that he will not render the promised performance when the time fixed for it in the contract arrives." *Carnes Co. v. Stone Creek Mech., Inc.,* 412 F.3d 845, 854 (7th Cir. 2005) (citing *Wis. Dairy Fresh, Inc. v. Steel & Tube Prods. Co.,* 20 Wis. 2d 415, 122 N.W.2d 361, 367 (1963)).   Mere doubts or questions about whether a party will perform are not sufficient to justify an anticipatory breach.  *Wis. Dairy Fresh, Inc.*, 20 Wis. 2d at 427.

Here, the record does not demonstrate that GQ Sand expressly repudiated the Agreement.  To the contrary, the record reflects GQ Sand's extensive efforts to secure both sand that met the specification *and* railcars to transport that sand.  Moreover, any finding of repudiation would necessarily require the jury to consider CBS's actions during the same period of time, including (1) communication that its customer AST was balking, (2) silence in the face of its view that GQ Sand missed four deliveries, only providing notice of default after CBS's claimed fifth delivery failure, and (3) sitting on testing showing concerns with WWS's sand quality for over two weeks.  These, too, raise material factual disputes as to whether GQ Sand repudiated the contract by manifesting an intent not to perform or whether CBS manufactured the repudiation.

Whether GQ Sand would have been able to perform under the contract also turns on the meaning of "default," and the required timeline for that performance.  There are also factual disputes as to the length of time required to transport frac sand from Wisconsin to Texas, and whether a round trip could occur in a one-week period, not to mention factual disputes with respect to whether the WWS sand met the specifications, or whether GQ Sand could still have acquired sand that met the specifications within the required time.  On top of these factual issues, if the jury were to find that CBS contributed to GQ Sand's difficulty by either tortuously interfering with GQ Sand's contract with RMS (or even committing fraud), then any repudiation theory would be unavailable.  *See* II Michael B. Apfeld *et al.*, *Contract Law in Wisconsin* § 12.35 (4th ed. 2013) ("[T]he nonrepudiating party must have clean hands before relying on repudiation.").

### III.  GQ Sand's Breach of Duty of Good Faith and Fair Dealing Claim Against CBS

GQ Sand also asserts a breach of duty of good faith and fair dealing claim.  In many ways, this claim is more straight-forward than GQ Sand's breach of contract claim, but nonetheless turns on material factual disputes.  Under Wisconsin law, the duty of good faith and fair dealing is implied in every contract and amounts to a guarantee by each party to the contract that he or she "will not intentionally and purposely do anything to prevent the other party from carrying out his or her part of the agreement, or do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Tang v. C.A.R.S. Prot. Plus, Inc.*, 2007 WI App 134, ¶ 41, 301 Wis. 2d 752, 734 N.W.2d 169 (quoting *Metro. Ventures, LLC v. GEA Assocs.*, 2006 WI 71, ¶ 35, 291 Wis. 2d 393, 717 N.W.2d 58); *see also* Wis. Stat. § 401.203 (Wisconsin U.C.C. codification of requirement).  Moreover, "conduct that might not rise to the level of fraud may nonetheless violate the duty of good faith in dealing with one's contractual partners and thereby give rise to a remedy under contract law." *Mkt. St. Assocs. Ltd. P'ship v. Frey*, 941 F.2d 588, 594-95 (7th Cir. 1991).

GQ Sand argues that CBS breached this duty by lulling it into believing that there was no rush to receive the shipments in light of AST balking at delivery, but then suddenly requiring GQ Sand to cure multiple missed delivery deadlines quickly.  There is support in the caselaw for this legal theory of a breach of duty of good faith and fair dealing claim.  *See LDC-728 Milwaukee, L.L.C. v. Raettig*, 2006 WI App 258, ¶ 13, 297 Wis. 2d 794, 727 N.W. 82 (affirming trial court's finding of breach of duty when party exercised right of first refusal knowing there was no reasonable likelihood party could

meet financial contingency and actually complete the transaction); *Wis. Nat. Gas Co. v. Gabe's Const. Co.*, 220 Wis. 2d 14, 24, 582 N.W.2d 118, 122 (Ct. App. 1998) (reversing trial court's grant of summary judgment on breach of duty of good faith and fair dealing claim, finding sufficient evidence that party was "lulled . . . into a false sense of security and prevented it from attempting to mitigate its liability").   Nonetheless, whether conduct is consistent with good faith and fair dealing necessarily depends on the facts of the case and, therefore, is ordinarily an issue for the finder of fact.  *See Peddie v. Sterling Jewelers, Inc.*, 282 F. Supp. 2d 947, 952 (E.D. Wis. 2003) (citing 23 Richard A. Lord, *Williston on Contracts* § 63.21 (4th ed. 2002)). Stated another way, while there is sufficient (arguably overwhelming) evidence for the jury to find in GQ Sand's favor, the evidence is not so one-sided as to permit entry of judgment as a matter of law.

## IV.  GQ Sand's Intentional Interference with Contract Claims

To prove intentional interference with an existing or prospective contract under Wisconsin law, a party must demonstrate that: "(1) the plaintiff had a contract or prospective contractual relationship with a third party; (2) the defendant interfered with the relationship; (3) the interference was intentional; (4) a causal connection exists between the interference and the damages; and (5) the defendant was not justified or privileged to interfere." *Burbank Grease Servs., LLC v. Sokolowski*, 2006 WI 103, ¶ 44, 294 Wis. 2d 274, 717 N.W.2d 781.

GQ Sand moves for summary judgment on its claim that CBS interfered with GQ Sand's Rail Delivery Agreement with RMS.  CBS opposes this motion on the basis that there are factual disputes as to whether it interfered with this contract.  Specifically, Rory

Conley denies directing Lyon not to deliver the railcars under the contract in order to hinder GQ Sand's ability to perform under the Sand Supply Agreement.  The court agrees with CBS that these factual disputes render summary judgment inappropriate.

Finally, GQ Sand also alleged tortious interference claims against (1) defendant RMS for its interference with GQ Sand's Supply Agreement with CBS; and (2) defendant NEJGID for its interference with both the Sand Supply Agreement and the Rail Delivery Agreement.  The same fact issues preclude summary judgment on these claims as well. There are factual disputes as to Hudspeth's role with respect to both contracts that prevent the court from entering judgment in plaintiff's favor at this time.[25]

ORDER

IT IS ORDERED that:

1)  Plaintiff and counter-defendant GQ Sand's motion for summary judgment (dkt. #50) is GRANTED as to defendant Range Management System LLC's negligence and misrepresentation claims, RESERVED as to summary judgment on its claims of breach of contract by RMS pending oral argument by the parties at the Final Pretrial Conference, and DENIED in all other respects.

2)  Defendant Conley Bulk Services, LLC's motion for summary judgment (dkt. #72) is DENIED.

---

[25] GQ Sand is correct in pointing out that NEJGID only responded to the tortious interference claim premised on the Sand Supply Agreement and failed to respond to GQ Sand's claim that NEJGID also interfered with the Rail Delivery Agreement.  (GQ Sand's Reply (dkt. #127) 32.) Still, this oversight does not warrant entry of summary judgment in plaintiff's favor. *See Johnson v. Hix Wrecker Serv., Inc.*, 651 F.3d 658, 662 (7th Cir. 2011) ("A party opposing summary judgment does not have to rebut factual propositions on which the movant bears the burden of proof and that the movant has not properly supported in the first instance.").

3) Going forward, the parties and the clerk's office should amend the caption of this case as set forth in the caption at the outset of this Opinion and Order.

Entered this 10th day of June, 2016.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge