GQ SAND, LLC,

                Plaintiff and Counterclaim Defendant,       OPINION AND ORDER

     v.

                                          15-cv-152-wmc

RANGE MANAGEMENT SYSTEMS, LLC, and NEJGID,
LLC,

                Defendants and Counterclaim Plaintiffs.

A jury found in favor of plaintiff GQ Sand, LLC, on breach of contract and tortious interference claims asserted against defendants Range Management Systems, LLC ("RMS") and NEJGID, LLC, and awarded total damages of $934,400. (Dkt. ##285, 286.) After accounting for the amount plaintiff received from a settling defendant, the court entered final judgment in its favor. (Dkt. #289.) Before the court are a number of post-judgment motions. In the first motion, defendants move for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) and for a new trial under Rule 59. (Dkt. #303.) That motion will be denied in its entirety because the court finds that (1) defendants waived certain of these challenges by failing to raise them in a Rule 50(a) motion; and (2) as to those challenges that were preserved, the jury's verdict is supported by a sufficient evidentiary basis.

In the second motion, plaintiff seeks an order holding defendants and their counsel in civil contempt based on defendants' disclosed confidential information subject to the court's protective order to third parties and used that information for a purpose unrelated to this litigation. (Dkt. #330.) While the court finds that defendants' sole member, Cody Lyon, and defendants' counsel, Attorney Kolten Jennings with the law

firm Puls Haney, PLLC, violated the court's protective order, it is uncertain whether GQ Sand suffered any loss. Whether plaintiff was actually injured by the disclosures ends up being a moot issue, since the relief that plaintiff seeks is the same as that requested in itss own motion to alter or amend the judgment, asking that the court *not* reduce the judgment by any anticipated payment by the settling defendant with an assignment of a credit, since both the assignment itself and the amount of any assignment remain uncertain. (Dkt. #290.) For the court will grant this motion, finding that since the court was apparently mistaken in reducing the jury's award of damages for tortious interference with the Sand Supply Agreement in light of the uncertainty of that payment, the court will grant both of plaintiff's motion and the requested relief in the form of entry of the corrected amount as reflected in the order below.

Finally, plaintiffs move for attorneys' fees as contemplated under the Rail Delivery Agreement and costs for the prevailing party. (Dkt. ##293, 294.) Having found defendant Range Management Systems breached that agreement, the court will grant that motion as well, including supplementing the award to reflect fees accrued post-judgment. (*See* dkt. #353.) Relatedly, plaintiff's unopposed bill of costs is well-documented and limited to approved categories of expenses. Accordingly, the court will further award plaintiff its costs against both defendants.

Plaintiff GQ Sand brought this civil action against defendants Conley Bulk Services, LLC, RMS and NEJGID, arising out of a multi-million dollar frac sand deal gone awry. All defendants in turn filed counterclaims against plaintiff, while NEJGID also asserted a cross-claim against Conley. The parties' disputes involve two, core agreements: a Sand Supply Agreement ("Supply Agreement" or "SSA") between GQ Sand and Conley; and a Rail Delivery Agreement ("Delivery Agreement" or "RDA") between GQ Sand and RMS. NEJGID's manager Carl Hudspeth played an intermediary role in establishing the Supply Agreement. Then at some point in 2015, after the events at issue in this action, RMS's sole member, Cody Lyon, purchased NEJGID from Hudspeth. In addition to the breach of contract claims, plaintiff also asserted various tortious interference with a contract claims and a civil conspiracy claim.

On the eve of trial, Conley and GQ Sand settled their cross-claims, leaving only plaintiff GQ Sand's claims against defendants NEJGID and RMS. At trial, the jury returned a liability verdict in favor of GQ Sand, finding that defendant RMS breached the Delivery Agreement (or RDA) and tortiously interfered with both the Supply Agreement (or SSA), and that NEJGID tortiously interfered with both agreements. (Liability Verdict (dkt. #285).) After the damage phase, the jury further awarded plaintiff: $45,000 in compensatory damages against RMS for breach of contract, $772,200 in compensatory damages against both defendants for tortious interference

---

[1] A more detailed background for this dispute is available at the court's 6/10/16 Op. & Order (dkt. #221) 3-25.

with the SSA, and $77,200 in compensatory damages against NEJGID for tortious interference with the RDA. (Damages Verdict (dkt. #286).)

## OPINION

### I. Defendants NEJGID and RMS's Motion for Judgment as a Matter of Law (dkt. #303)

Under Rule 50, judgment may be granted as a matter of law where there is no "legally sufficient evidentiary basis" to uphold the jury's verdict on that issue. Fed. R. Civ. P. 50(a). In reviewing a Rule 50 motion, the court will "examine the evidence presented, combined with any reasonably drawn inferences, and determine whether that evidence sufficiently supports the verdict when viewed in the light most favorable to the non-moving party," which in this case, is the plaintiff GQ Sand. *E.E.O.C. v. AutoZone, Inc.*, 707 F.3d 824, 835 (7th Cir. 2013).

In particular, the court will not make credibility determinations or weigh the evidence. Rather, the court must assure that more than "a mere scintilla of evidence" supports the verdict, *Hossack v. Floor Covering Assocs. of Joliet, Inc.*, 492 F.3d 853, 859 (7th Cir. 2007). reversing "only if no rational jury could have found for the prevailing party." *AutoZone, Inc.*, 707 F.3d at 835. Moreover, "[b]ecause the Rule 50(b) motion is only a renewal of the preverdict motion, it can be granted only on grounds advanced in the preverdict motion." *Wallace v. McGlothan*, 606 F.3d 410, 418 (7th Cir. 2010); *see also Thompson v. Mem'l Hosp. of Carbondale*, 625 F.3d 394, 407 (7th Cir. 2010) (refusing to consider the defendant's argument that plaintiff failed to demonstrate that he suffered an adverse employment action, in part, because the defendant did not raise argument in

4

Rule 50(a) motion); Fed. R. Civ. P. 50 cmt. 1991 Amendments ("A post-trial motion for judgment can be granted only on grounds advanced in the pre-verdict motion.").

Defendants also move for a new trial under Rule 59, which "may be granted only if the jury's verdict is against the manifest weight of the evidence." *King v. Harrington*, 447 F.3d 531, 534 (7th Cir. 2006) (citing *ABM Marking, Inc. v. Zanasi Fratelli, S.R.L.*, 353 F.3d 541, 545 (7th Cir. 2003)). To meet this standard, defendants must demonstrate that no rational jury could have rendered a verdict against them. *See King*, 447 F.3d at 534 (citing *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 926 (7th Cir. 2004)). In making this evaluation, the court must view the evidence in a light most favorable to plaintiff, leaving issues of credibility and weight of evidence to the jury. *King*, 447 F.3d at 534. "The court must sustain the verdict where a 'reasonable basis' exists in the record to support the outcome." *Id.* (quoting *Kapelanski v. Johnson*, 390 F.3d 525, 530 (7th Cir. 2004)).

Defendants cannot overcome these high hurdles. *First*, defendants argue that "[t]he evidence is legally insufficient to support the verdict rendered by the jury in regards to RMS breaching the RDA as it was void from the onset because it was impossible to perform." (Defs.' Mot. (dkt. #303) ¶ 15.) More specifically, defendants contend that RMS could not have performed the terms of the contract because the Allied Rail Terminal in Tomah, Wisconsin, could not accept railcars. RMS made the same arguments in its motion for summary judgment, which the court also rejected. (6/10/16 Op. & Order (dkt. #221) 28-32.) Defendants similarly raised a challenge to the breach of contract claim based on impossibility in their Rule 50(a) motion. (6/28/16 Trial Tr.

(dkt. #301) 126-27.)    Consistent with the law, the jury was instructed that:    "If performance of a promise is impossible because of a state of facts existing when the contract was made and the promisor had no knowledge or reason to know of such facts, there is no duty to perform."  (Jury Instr. (dkt. #282) 5.)  *See also Scherrer Construction Co. v. Burlington Mem'l Hosp.*, 64 Wis. 2d 720, 733, 221 N.W.2d 855 (1974) ("[A] promise imposes no duty if performance of the promise is impossible because of facts existing when the promise is made of which the promiser neither knows nor has reason to know.").

However, GQ Sand presented more than sufficient evidence from which a jury could reasonably reject this impossibility defense.  For example, GQ Sand points to evidence that it specifically relied on the sand supplier WWS's representation that the Allied Terminal could receive 20 covered hopper rail cars.  (Pl.'s Opp'n (dkt. #324) 6-7.) Plaintiff GQ Sand also presented evidence that RMS was the party with an account with the Union Pacific ("UP") railroad and knew of the plan to use the Allied Terminal a week before the execution of the RDA, providing ample time for RMS to confirm the viability of that terminal.  (*Id.* at 7.)

Plaintiff further presented evidence that RMS learned of the unavailability of the Allied Terminal (at least initially and at the full 20 car requirement) within one hour of signing the RDA, yet failed to inform GQ Sand.  (*Id.* at 8.)  The evidence also demonstrated that RMS continued to assure GQ Sand the cars were being released and moved into position, even though the cars were never in Wisconsin, or at least a reasonable jury could so find.  (*Id.* at 8.)  Finally, plaintiff presented evidence

demonstrating that even after UP approved delivery of 10 cars to the Allied Terminal, RMS still failed to produce those cars.[2]

Defendants' motion to dismiss also ignores the fact that plaintiff alleged, and the court instructed, on a breach of duty of good faith and fair dealing, which was part of the breach of contract verdict question. The jury was instructed that "[a] contracting party can breach the duty of good faith even if it did not violate any express term of the contract." (Jury Instr. (dkt. #282) 4.) Consistent with this claim, plaintiff presented compelling evidence of: (1) RMS's acceptance of the security deposit and other payments; (2) RMS's failure to inform plaintiff of difficulty it encountered in performing the contract, repeatedly assuring that the railcars were moving into position; and (3) RMS's assent to the change of location to Hixton and continued failure to perform. This evidence was more than sufficient to support the jury's finding of a breach of duty of good faith and fair dealing.

Defendants further argue that the submission of a jury instruction on modification of contract by conduct was "improper" because the RDA's express terms required any amendment to the agreement to be in writing. (Defs.' Mot. (dkt. #30) ¶¶ 21-22.) As an initial matter, defendants failed to raise any objection to this instruction at any point, thus waiving it. (Pl.'s Opp'n (dkt. #324) 9-10.) Tellingly, defendants also failed to respond to plaintiff's waiver argument in their reply, presumably conceding that they have no basis to object to the instruction at this late date. Regardless, the court

---

[2] A reasonable jury could also have found that the parties modified the contract by conduct, designating a new pick-up location in Hixton, Wisconsin, and RMS failed to produce railcars to that location as well. While defendants argue that the Hixton arrangement was a new contract, the jury need not have accepted this argument.

finds no error in giving a modification by conduct instruction, especially when viewed in light of the waiver of strict performance instruction, which permitted the jury to find waiver of contractual provisions -- including the written amendment requirement -- either "expressly or . . . inferred from the conduct of the parties." (Jury Instr. (dkt. #282) 4-5.) *See also Royster-Clark, Inc. v. Olsen's Mill Inc.*, 2006 WI 46, ¶¶ 3, 46-48, 290 Wis. 2d 264, 714 N.W.2d 530 (holding that contracts with unambiguous provisions requiring written modification could be modified by an oral agreement of the parties). As such, the court rejects defendants' motion for either judgment as a matter of law or a new trial on the jury's finding that RMS breached the RDA.

*Second*, defendants challenge the jury's finding that both RMS and NEJGID tortiously interfered with the Sand Supply Agreement between GQ Sand and Conley. In support of their motion, defendants contend that: (1) the SSA was impossible to perform; and (2) Conley terminated the contract unilaterally. (Defs.' Mot. (dkt. #303) ¶ 22.) As plaintiff points out, defendants again failed to move for directed verdict on this claim, instead solely moving on the breach of contract claim. (*See* 6/28/16 Trial Tr. (dkt. #301) 126-27 (limiting Rule 50(a) motion to breach of contract claim).) Defendant similarly failed to address this waiver argument in their reply brief, again apparently conceding that their Rule 50(b) challenge is not proper. *See Wallace*, 606 F.3d at 418.

Even if preserved, defendants failed to present any evidence or argument to the jury in support of their claim that the plaintiff's performance on the SSA was impossible given the timing of sand deliveries. As for any argument based on the sand quality, GQ Sand presented sufficient evidence from which a reasonable jury could find that the sand

met the required specifications. Regardless, defendants' challenge does not directly address the jury's determination that defendants interfered with the SSA; instead, defendants' argument that plaintiff could not have performed the contract terms would only be relevant to the jury's determination that plaintiff was injured by the interference and the amount of damages awarded to address that injury. Defendants raise no independent challenge to the jury's award of damages.

In any event, plaintiff presented *overwhelming* evidence that RMS, NEJGID and Conley worked together to thwart GQ Sand's ability to perform its obligations under the SSA, all in an effort to provide Conley with an out in light of its customer's decision to not purchase the amount of sand originally requested and for which Conley contracted with GQ Sand.[3] Specifically, plaintiff presented evidence (1) that RMS sent NEJGID and Conley for their review and authorization a letter drafted to GQ Sand changing the terms of the contract, in particular requiring a significant additional payment, (2) of multiple text messages between Conley, RMS and NEJGID about holding up the railcars and promises to RMS of another business deal, which a reasonably jury could view as a quid-pro-quo for RMS's agreement to not send the railcars, and (3) of NEJGID's attempts to have GQ Sand abandon the SSA and its position in connecting Conley with GQ Sand's rail car provider RMS. (Pl.'s Opp'n (dkt. #324) 19-23.) All of this was

---

[3] Oddly, defendants argue that it was *Conley* who asked that RMS not allow their railcars to get to Wisconsin and not the other way around. (Def.'s Mot. (dkt. #303) ¶ 24.) The fact that Conley may have requested RMS's interference in GQ Sand's performance of the SSA in no way undermines the jury's finding of interference. If anything, defendants concede that RMS failed to deliver railcars in response to Conley's request to undermine GQ Sand's ability to perform as required under the SSA.

ample evidence to support the jury's finding of tortious interference as to both defendants, at least for purposes of denying a Rule 50(b) challenge (assumed defendants had preserved it) and a Rule 59 motion.

*Third*, defendants challenge the jury's finding that NEJGID tortiously interfering with the RDA. Plaintiff again argues that defendants waived this challenge by failing to bring a Rule 50(a) motion. In response, defendants point to their motion for a directed verdict on the breach of RDA claim on the basis of impossibility -- more specifically, that one cannot interfere with a contract that is "rescinded due to impossibility." (Defs.' Reply (dkt. #326) ¶ 8.) Whether this argument constituted a separate challenge to plaintiff's tortious interference claim against defendant NEJGID is essentially academic, since defendants sole challenge to the jury finding is still that the RDA was impossible to perform. Because the court already rejected that argument above, the court must also reject defendants' challenge to plaintiff's tortious interference claim. Regardless, plaintiff put forth sufficient evidence to support the jury's verdict, including that: (1) NEJGID participated in a phone call between Conley and Cody Lyon with RMS to ensure that rail cars did not make it to GQ Sand; and (2) NEJGID told RMS that GQ Sand would not have the money to pay for the cars. (Pl.'s Opp'n (dkt. #324) 24-25.)

## II. GQ Sand's Motion for Contempt (dkt. #330)

As discussed above, GQ Sand settled with defendant Conley on the eve of trial. Because the injury caused by defendant RMS and NEJGID's tortious interference with the SSA is necessarily the same caused by Conley's induced breach of the SSA, the court and the remaining parties agreed that the jury verdict would be reduced by the amount

paid by the settling party. (*See* 7/1/16 Text Order (dkt. #288); 6/29/16 Trial Tr. (dkt. #299) 56-57.) Accordingly, the court ordered plaintiff to file its confidential settlement agreement with Conley under seal. (6/29/16 Trial Tr. (dkt. #299) 57; Settlement Agreement (dkt. #278).) Addressing plaintiff's concern about a possible, unauthorized disclosure of that agreement's terms, the court also stated, "obviously because it's under seal, you will still have access to it. But no one else will outside and it should be maintained as confidential[.]" (6/29/16 Trial Tr. (dkt. #299) 57.) In addition, the filing of the agreement under seal was consistent with the stipulated protective order entered in this case. (Stip. Protective Order (dkt. #32).)

In this motion, plaintiff requests that the court find defendants and their attorney in civil contempt for violating the court's order to maintain the confidentiality of the settlement agreement between GQ Sand and Conley, as well as other documents produced during discovery. (Pl.'s Mot. (dkt. #330).) Plaintiff seeks a remedial sanction for these violations. *See Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 738 (7th Cir. 1999).

Without disclosing confidential information, the settlement agreement generally contemplated the release of certain additional funds from an escrow account if another sand provider, Wisconsin White Sand ("WWS"), honored a credit held by GQ Sand and made that sand available to Conley. In support of its motion, therefore, plaintiff directs the court to two communications to WWS, one by Cody Lyon, the sole member of defendant RMS and NEJGID, and a second by defendants' counsel Attorney Kolten Joennings with the law firm Puls Haney PLLC. Both communications occurred within

days of the jury's June 29, 2016, verdict in plaintiff's favor and the filing of the confidential settlement agreement.

In the first communication, Lyon is emailing WWS owners, employees or former employees and WWS's attorney Mark Dausch. (Dausch Decl., Ex. A (dkt. #332-1).) In this July 1, 2016, email, Lyon thanked Timothy Brewer, one of WWS's employees, for taking his call the night before, referenced attachments to the email, and stated that: "GQ Sands is not entitled to WWS' other company credits. Latest, GQ Sands has 'insured' to Conley Bulk Services that the WWS credits can be used to settle Conley's claims." (*Id.*) Lyon then states that it is *his* companies that own assignments to these credits.

A letter is attached to that same email, also dated July 1, 2016, which concerns "1) Establish Rockpile Claim & Credit Balance, Establish K3 Prop, LLC Claim & Credit Balance;" and "2) LEGAL 'NOTICE' & Explanation of 'Notice.'" (*Id.* at pp.2-3.) The letter further purports to disclose banking records showing a payment stream, and it informs WWS that another one of Lyon's companies K3Prop, LLC, will be adding WWS as a defendant in another case pending in this court if it sells the credits claimed by GQ Sand. In addition, there are various documents attached to the letter itself -- most notably for purposes of the present motion, an internal WWS email dated April 6, 2015, describing the credit balance to GQ Sand. This document is further identified as "Exhibit 92" and marked "CONFIDENTIAL." (*Id.* at 17-18.) As counsel for plaintiff explains in his affidavit, Exhibit 92 was produced by GQ Sand in response to a subpoena by WWS in the course of discovery in this action. (Watt Decl. dkt. #331) ¶ 4; *id.*, Ex. A

(dkt. #331-1).)  The document's confidential designation, therefore, falls under the court's protective order.

The second communication is a July 20, 2016, email from Lyon's attorney Kolter Jennings of the Puls Haney law firm to WWS's attorney Mark Dausch and WWS employees.  (Dausch Aff., Ex. B (dkt. #332-2).)  The email states, "[p]lease accept the attached as notice of claims asserted on #2014-00103 & #2014-0010."  (*Id.* at 1.) Attached to the email is a letter, in which Jennings provides notice that two of Lyon's companies have a legal claim for ownership in two account credits held by WWS.  The letter further provides, "[o]n information and belief, Wisconsin White Sand has been approached to give up or sell either one or both of the aforementioned credits.  This letter serves as official legal **notice** that Wisconsin White Sand does not have legal authority to sell, transfer or dispose of the credits mentioned herein."  (*Id.*)

Naturally, much of plaintiff's brief concerns whether defendants interfered with its ability to sell its WWS credit to Conley as contemplated by the settlement agreement between those parties.  While plaintiff may have a meritorious tortious interference claim premised on these allegations, and while these facts may be pertinent to crafting an appropriate sanction, the threshold issue is whether defendants violated "an unequivocal command from the court."  *United States v.* Dowell, 257 F.3d 694 (7th Cir. 2001) (citing Jones, 188 F.3d at 737) (discussing standard for finding a party in civil contempt).  As such, the court's focus is on whether Lyon and/or Attorney Jenning's communications violate the court's protective order in this case.

As an initial matter, Lyon disclosed Exhibit 32 in his July 1, 2016, email, despite it having been marked "confidential" under the provisions of the protective order in this case. While the court credits plaintiff's concern that this exhibit was shared with unauthorized individuals under the terms of protective order for disclosure, *WWS* produced the exhibit in response to a third-party subpoena issued by plaintiff in this action. While the disclosure to WWS of one of its own documents may technically violate the protective order, the court finds no basis for sanctioning defendants based solely on that disclosure itself.

The protective order, however, also provides that all confidential documents *and* information "shall be used solely for the prosecution or defense of this Action -- including any appeal -- and shall not be used for any other purposes." (Dkt. #32 at § 1(d).) Here, Lyon plainly used a confidential document produced during discovery *and* material information from a confidential settlement agreement, which was also filed under seal at this court's direction for the purpose of asserting a claim to an account credit and hindering GQ Sand's ability to use that credit.

Defendants' attorney's actions are equally egregious. While Attorney Jennings attempts to down-play his knowledge of the role of the credit in the settlement agreement -- by stating that his concern about WWS assigning certain credits was based "on information and belief" -- Jennings had *actual* knowledge of GQ Sand's attempts to assign those credits to Conley based on the confidential settlement agreement filed under seal in this case.

In response, defendants assert that the WWS credits were known outside of this lawsuit, directing the court to a reference to "mine credit" in a July 24, 2016, text message from Brock Brockinton of Conley to Lyon, but does not explain how they knew this reference is to the WWS credit. Moreover, the text message was sent *before* GQ Sand's settlement with Conley, and at most, alludes to the *possibility* that this credit may be in play in such settlement. The knowledge that GQ Sand was actually attempting to assign the credit came from a confidential settlement agreement, something of which defendants became aware because of this court's order requiring plaintiff to file it under seal. As a result, both Cody Lyon and Attorney Jennings used confidential materials, including the information from the confidential settlement agreement filed under seal, for a purpose unrelated to this lawsuit in direct violation of this court's protective order. As such, the court will hold both in civil contempt.

The next question is what the consequence of this contemptuous conduct should be. Plaintiff asks for a remedial, backward looking sanction. Such a remedy appropriately "seek[s] to compensate an aggrieved party for losses sustained as a result of the contemnor's disobedience of a court's order or decree made for the aggrieved party's benefit." *Jones*, 188 F.3d at 738.

As set forth in plaintiff's submissions, while WWS and its attorney Gene Tempesta were initially receptive to the proposed assignment of GQ Sand's credit to Conley, after defendants' communications, WWS's attorney became less responsive. (Pl.'s Mot. (dkt. #330) 5.) The day after the deadline for GQ Sand to secure the assignment of the credit to Conley, WWS's attorney finally returned GQ Sand's call,

15

indicating confusion from WWS was part of the reason for the delay. (*Id.* (citing Watt Decl. (dkt. #331) ¶ 13.) By that point, the opportunity had passed, since Conley then refused to extend the deadline.

In response, defendants contend that WWS was never willing to assign the credits in the first place, directing the court to a letter from Attorney Dausch to defendants' attorneys indicating that the two contracts referenced in Jennings' July 21, 2016, letter, described above, have "significant outstanding balances owed . . . not monetary credits." (Defs.' Opp'n (dkt. #337) ¶ 15; Dausch Decl., Ex. X (dkt. #332-3) 3.)[4] While this letter raises some question as to whether WWS's ultimate decision not to assign the credits to Conley was caused by defendants' contemptuous disclosure and misuse of confidential information, or whether the assignment was unachievable, independent of defendants' actions, but that uncertainty is *defendants'* doing. As a matter of equity, it would seem appropriate to resolve that uncertainty *against* defendants and its counsel as the wrongdoers. Fittingly, the court need not resolve this dispute because, even absent a showing that GQ Sand suffered a loss because of defendants' contempt, plaintiff's motion to amend the judgment provides the same relief. The court, therefore, turns to that motion.

---

[4] Defendants filed a motion for leave to file a supplement to their original brief in response, arguing that "the reply from the Plaintiff continued to confuse the interests of the parties and the supplement will allow Defendants to show the Court the inaccuracies being presented by the Plaintiff." (Def.'s Mot. (dkt. #344.).) The court views the supplement as a regurgitation of the original opposition. Regardless, the court previously granted the motion and has considered this sur-reply.

### III. GQ Sand's Motion to Amend Judgment (dkt. #290)

As described above, because the injury caused by defendants' tortious interference with the SSA is the same injury plaintiff suffered by the breach itself, the court agreed that the jury award should be reduced by the amount plaintiff received from Conley as part of their settlement for its alleged breach. *See Donovan v. Robbins*, 752 F.2d 1170, 1178 (7th Cir. 1985) ("Since a plaintiff's total recovery, from all the tortfeasors together, is not allowed to exceed his total damages, the amount that the nonsettling defendants will have to pay will be smaller, the larger the settlement is.") Accordingly, the court reviewed the confidential settlement agreement and deducted the payment from Conley, including the planned assignment of WWS credit as described above.

The same day this court entered judgment, however, plaintiff filed a motion to alter or amend the judgment, requesting that the court only reduce the judgment against defendants by the amount Conley paid under the confidential settlement agreement, *not* including the credit balance held by WWS. As plaintiff explains in its motion, any payment by Conley for the assignment of the WWS credit is now uncertain, given the likelihood that WWS will either refuse the assignment or reduce the value of it to reflect the current market price. (Pl.'s Mot. (dkt. #290) ¶¶ 7-9.) Since the only reason why the court reduced the judgment was to prevent plaintiff from receiving *more* than its total injury, the court agrees that it should not have included an uncertain payment of a possible assignment of a credit in that calculation. As such, the court finds an amendment of the judgment under Federal Rule of Civil Procedure 60(a) is appropriate.[5]

---

[5] In originally reviewing the confidential settlement agreement, the court mistakenly viewed the

**IV. GQ Sand's Motion for Award of Attorneys' Fees (dkt. #294)**

In this motion, plaintiff seeks an award of attorneys' fees in the amount of $156,579, which reflects the supplemental request for fees incurred as a result of defendants' post-judgment actions. (Pl.'s Mot. for Fees (dkt. #294); Suppl. (dkt. #328).) Plaintiff's motion is based on two provisions of the RDA. The first is a standard fee-shifting provision for the prevailing party:

> If any litigation shall be commenced to enforce, or relating to, any provision of this Agreement, the prevailing party shall be entitled to an award of reasonably attorney fees and reimbursement of such costs as it incurs in prosecuting or defending such litigation.

(Ex. 3 at § 14.) Another provision of the contract requires RMS to indemnify and hold harmless GQ Sand for any damages it suffers as a result of RMS's breach of the RDA:

> RMS agrees to indemnify, defend, reimburse, and hold harmless [GQ Sand] . . . from and against any and all claims, liabilities, losses or damages, *including any attorneys' fees*, as a result of any claim, suit, action administrative proceeding, demand, judgment or settlement arising out of the following (i) RMS's breach or violation of any of the provisions of this Agreement . . . .

(Ex. 3 at § 6.1.)

In response to the motion, defendants simply argue that: (1) plaintiff waived any right to attorney's fees through its settlement agreement with Conley, in which the parties agreed to be responsible for their own attorneys' fees; and (2) performance was

---

additional payment from Conley for assignment of the credits as a *definite* transaction, without appreciating the uncertainty as to whether the assignment would occur or the amount of the credit if assigned. The defendants' subsequent, contemptuous acts to ensure that WWS not honor the assignment of credits, if any, serves to underscore that uncertainly.

impossible under the RDA.[6] As for the first argument, defendants' assertion that plaintiff somehow waived any right to pursue attorney's fees against RMS because of its settlement with Conley is absurd. The fact that GQ Sand and Conley agreed to cover their own attorneys' fees, rather than include a payment of attorneys' fees as part of that settlement, in no way precludes GQ Sand from seeking fees against a different defendant for a breach of contract claim based on a different contract. Perhaps defendants could have argued that the amount requested should be reduced to reflect the fees incurred by plaintiff in pursuing claims against RMS for violations of the RDA. Defendants made no such argument. Moreover, given the overlapping nature of the claims and the breadth of the indemnification provision in the RDA, it would be very difficult for the court to award plaintiff a narrowed subpart of its total fees. Finally, defendants' conduct has been increasingly outrageous in this case as they continue to seek ways to avoid responsibility for their actions, making the court strongly disinclined to parse those fees regardless. The second basis for objecting to plaintiff's fee request -- that the RDA was impossible to perform -- has already been rejected by this court. Accordingly, no more needs to be said on this challenge.

In support of its motion, plaintiff's counsel submitted well-documented time records and invoices, representing that, at the time of the filing, over two-thirds of the invoiced amount had been paid by plaintiff. (Watt Decl. (dkt. #295); Watt Decl. (dkt.

---

[6] Defendants also argue that the motion is premature in light of their pending motion for judgment as a matter of law. Had the court granted defendants' motion with respect to the breach of RDA claim, the court would obviously not award fees, but the fact that defendants *filed* a motion for judgment as a matter of law does not render plaintiff's motion premature.

#329).)  The court finds the amount of time and the hourly rates charged reasonable, especially in light of the fact that plaintiff paid several invoices.  *See Medcom Holding Co. v. Baxter Travenol Labs*, 200 F.3d 518, 521 (7th Cir. 1999) (best evidence of fees is the amount that commercial parties incurred and paid knowing that they had to cover the outlays themselves).  Regardless, defendants do not challenge the reasonableness of the hourly rates or the amount of time spent litigating this case, nor could they, having failed to submit their own invoices and time records as required by the court to make such an objection.  (6/28/16 Trial Tr. (dkt. #298) 56-57.)  Accordingly, the court will award plaintiff attorneys' fees against defendant Range Management Systems, LLC, in the full amount requested -- $156,579.00.

**V.  GQ Sand's Bill of Costs (dkt. #293)**

Finally, GQ Sand as the prevailing party seeks an award of costs pursuant to Federal Rule of Civil Procedure 54(d)(a).  Defendants offered no objection to plaintiff's request.  The court finds plaintiff's bill of costs well-documented and otherwise reasonable.  Accordingly, the court will award plaintiff costs in the amount of $27,688.96 against both defendants.

ORDER

IT IS ORDERED that:

1) Plaintiff GQ Sand, LLC's motion to alter or amend judgment (dkt. #290) is GRANTED.

2) Plaintiff's bill of costs (dkt. #293) is GRANTED.  Plaintiff is awarded $27,688.96 in costs against both remaining defendants.

3) Plaintiff's motion for attorney's fees (dkt. #294) as supplemented (dkt. #328) is GRANTED. Plaintiff is awarded $156,579.00 in attorney's fees against defendant Range Management Systems, LLC.

4) Defendants NEJGID, LLC and Range Management Systesm, LLC's motion for judgment as a matter of law (dkt. #303) is DENIED.

5) Plaintiff's motion for contempt (dkt. #330) is GRANTED as to a finding of contempt, but DENIED in all other respects.

6) The clerk of court is directed to enter an amended judgment reflecting (1) the change in the amount of the original judgment's first provision from $458,200.00 to $641,200.00; (2) an award of attorneys' fees against defendant Range Management Systems, LLC, in the amount of $156,579.00; and (3) an award of costs against both defendants in the amount of $27,688.96.

Entered this 30th day of September, 2017.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge